IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–01592–EWN–KLM


BRONWYN ANGLIN,

     Plaintiff,

v.

CITY OF ASPEN, COLORADO, a municipality,
LOREN RYERSON, CHIEF OF POLICE, in his official and individual capacity,
ASPEN POLICE OFFICER MELINDA CALVANO, in her official and individual capacity,
ASPEN POLICE OFFICER DAN DAVIS, in his official and individual capacity,
PITKIN COUNTY COMMISSIONERS, in their official and individual capacities,
PITKIN COUNTY SHERIFF ROBERT BRAUDIS, in his official and individual capacity,
PITKIN COUNTY DEPUTY SHERIFF WALT GEISTER, in his official and individual capacity,
DOCTOR CHRIS MARTINEZ,

     Defendants.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____


     This is a civil rights case in which Plaintiff Brownyn Anglin alleges Defendants violated

her rights to due process and free speech, as well as her right to be free from unreasonable

seizure, by forcibly injecting her with antipsychotic medication while she was in custody at the

Pitkin County Jail.  This matter is before the court on "Medical Defendants' Joint Motion for

Summary Judgment and Brief in Support," filed April 11, 2007.  Three other summary judgment

motions are currently pending before the court in this case.  The instant motion is brought solely

by Defendant Chris Martinez, M.D., who authorized Plaintiff's forcible injection.[1]  Jurisdiction is

premised upon the existence of a federal question pursuant to 28 U.S.C. §§ 1331 and 1343.

## FACTS

### 1.    *Factual Background*

On the evening of December 11, 2004, Plaintiff, her boyfiend Byron Hawkins, and her

four-year-old daughter attended a dinner party at the apartment of Plaintiff's friend, Amber

Nespeca.  (Br. in Supp. of Mot. for Summ. J. Filed on Behalf of Defs., City of Aspen, Police

Chief Loren Ryerson and Officer Dan Davis [hereinafter "Aspen Defs.' Br."], Statement of

Undisputed Material Facts [hereinafter "SOF"]  ¶ 1 [filed Apr. 11, 2007]; *admitted at* Resp. to

Aspen Defs.' Mot. for Summ. J., [hereinafter "Pl.'s Aspen. Resp."], Resp. to Statement of

Undisputed Material Facts [hereinafter "RSOF"] ¶ 1 [filed June 14, 2007].)[2]  Kevin Dunkleburg,

Ms. Nespeca's boyfriend, also attended the party.  (*Id.*)  Over the course of the evening, Plaintiff

consumed four to five glasses of wine.  (*Id.*, SOF ¶ 2; *admitted at* Pl.'s Aspen. Resp., RSOF ¶ 2.)

During the dinner party, Ms. Nespeca and Mr. Dunkleburg became embroiled in an argument, and

Plaintiff witnessed Mr. Dunkleburg hitting Ms. Nespeca.  (*Id.*, SOF ¶ 3; *admitted at* Pl.'s Aspen.

---

[1]The other Defendants who originally brought this motion along with Dr. Martinez —
Aspen Valley Hospital District and Paramedics Damien Coniglio and Mark Hutchinson
(collectively "Medical Defendants") — have been dismissed from the case.  (*See* Order Dismissing
Def. Aspen Valley Hosp. with Prejudice [filed June 22, 2007]; Order Dismissing Defs. Coniglio,
Hutchinson with Prejudice [filed June 22, 2007].)

[2]In his motion for summary judgment, Dr. Martinez, adopts the facts offered by the Aspen
Defendants in their motion for summary judgment.  (*See* Med. Defs.' Joint Mot. for Summ. J. and
Br. in Supp. at 5 [filed Apr. 11, 2007] [hereinafter "Med. Defs.' Br."].)

Resp., RSOF ¶ 3.)  In an effort to calm the situation, Plaintiff called 9-1-1, and Defendants Aspen

Valley Police Officers Melinda Calvano and Ron Fabrocini, as well as Officer Dan Davis were

dispatched to the scene.  (*Id.*, SOF ¶¶ 3–4; *admitted at* Pl.'s Aspen. Resp., RSOF ¶¶ 3–4.)  Upon

arrival, Ms. Nespeca and Messrs. Dunkleberg and Hawkins all told the police that Ms. Nespeca

had actually been the aggressor and that Mr. Dunkleberg had not assaulted her.  (*Id.*, SOF ¶ 4;

*admitted at* Pl.'s Aspen. Resp., RSOF ¶ 4.)  The police then arrested Ms. Nespeca and took her

to Pitkin County Jail.  (*Id.*)

        In an effort to secure Ms. Nespeca's release, Plaintiff left her daughter in the care of Mr.

Hawkins and hitchhiked to the jail.  (*Id.*, SOF ¶¶ 7–8; *admitted at* Pl.'s Aspen. Resp., RSOF ¶¶

7–8.)  Jail personnel allowed Ms. Nespeca to come to the teller window to give Plaintiff her ATM

card and PIN number so that Plaintiff could obtain sufficient funds to bond Ms. Nespeca out of

jail.  (*Id.*, SOF ¶ 8; *admitted at* Pl.'s Aspen. Resp., RSOF ¶ 8.)  Plaintiff left the jail and returned a

short time later with the funds.  (*Id.*, SOF ¶ 11; *admitted at* Pl.'s Aspen. Resp., RSOF ¶ 11.)  She

was then informed that Ms. Nespeca would not be released.  (*Id.*, SOF ¶¶ 9–10; *admitted at* Pl.'s

Aspen. Resp., RSOF ¶¶ 9–10.)

        Plaintiff proceed to the jail lobby where she called 9-1-1 from her mobile phone in an

attempt to reach a county sheriff who could help her get Ms. Nespeca released from jail.  (*Id.*,

SOF ¶ 11; *admitted in relevant part at* Pl.'s Aspen. Resp., RSOF ¶ 11.)  Plaintiff was unsure how

to reach a county sheriff at that time of night other than by calling 9-1-1.  (Resp. to Med. Defs.'

Mot. for Summ. J. [hereinafter "Pl.'s Med. Resp."], Statement of Additional Disputed or

Undisputed Facts [hereinafter "SAF"] ¶ 1[filed June 14, 2007]; *admitted at* Dr. Martinez's Reply

in Supp. of the Med. Defs.' Joint Mot. for Summ J. [hereinafter "Martinez's Reply"] at 3–4 [filed

July 9, 2007].)[3]  After being put on hold, Plaintiff hung up and called 9-1-1 a second time.

(Aspen Defs.' Br., SOF ¶ 12; *admitted in relevant part at* Pl.'s Aspen Resp., RSOF ¶ 12.)  Again,

the dispatcher placed Plaintiff on hold, and, again, Plaintiff hung up and called 9-1-1.  (*Id.*)

Soon thereafter, the 9-1-1 dispatcher called the jail booking room to report that Plaintiff

was interfering with her ability to respond to other emergency calls.  (*Id.*, SOF ¶ 13; *admitted in*

*relevant part at* Pl.'s Aspen Resp., RSOF ¶ 13.)  Officers Calvano and Davis proceeded to the

lobby and shackled and handcuffed Plaintiff without warning.  (Pl.'s Med. Resp., SAF ¶ 2;

*admitted at* Martinez's Reply at 3–4.)  Officer Davis informed Plaintiff that she was going to be

placed in maximum security, which frightened Plaintiff and led her to resist the officers.  (Aspen

Defs.' Br., SOF ¶ 14; *admitted at* Pl.'s Aspen Resp., RSOF ¶ 14.)  Plaintiff testified that, on the

way to the cell, she repeatedly pled for an opportunity to telephone her daughter.  (*Id.*, SOF ¶ 15;

*admitted at* Pl.'s Aspen Resp. ¶ 15.)  According to Plaintiff, Officer Davis responded by stating he

could not allow her to make the phone call because of the "Patriot Act."  (*Id.*)

Plaintiff was placed in a maximum security cell, and her shackles and handcuffs were

removed.  (*Id.*)  The cell was tiny, and Plaintiff is claustrophobic.  (Pl.'s Med. Resp.; *id.*, SAF ¶ 3;

*admitted at* Martinez's Reply at 3–4.)  The cell had a small, narrow window that prevented

Plaintiff from seeing anyone outside it.  (*Id.*)

---

[3]For the purposes of the instant motion, Dr. Martinez admits all facts proffered by Plaintiff
in her response.  (*See* Martinez's Reply at 3–4.)

For the next ten minutes, Plaintiff pounded on the door of her cell and pleaded loudly for an opportunity to call her daughter. (Aspen Defs.' Br., SOF ¶ 16; *admitted at* Pl.'s Aspen Resp., RSOF ¶ 15.) Plaintiff testified that, after about ten minutes of shouting and pounding, Officer Davis came to her cell and said, "If you don't shut up, I'll have you sedated." (*Id.*) Plaintiff testified that she continued periodically shouting and pounding on the cell door. (*Id.*)

Defendant Officer Calvano testified that she did not know what Plaintiff was yelling, but called it "intrusive to the inmates" and "obstructive" to jail staff. (Pl.'s Med. Resp., SAF ¶ 5; *admitted at* Martinez's Reply at 3–4.) Defendant Deputy Walt Geister testified that he told Plaintiff that if she continued to pound against the door "we're going to contact the hospital and see about sending the paramedics and having [you] sedated."[4] (*Id.*, Ex. 2 at 6 [Geister Dep.].) Further, Deputy Geister testified that he was concerned Plaintiff would injure herself given her pounding and shouting and that he thought Plaintiff needed to be chemically sedated. (Aspen Defs.' Br., SOF ¶ 17; *admitted at* Pl.'s Aspen. Resp., RSOF ¶ 17.) However, he understood sedation to be a medical decision that medical authorities would ultimately have to make. (*Id.*)

Deputy Geister attempted to reach an emergency room doctor but was unable to do so. (*Id.*) Therefore, he had the paramedics paged. (*Id.*) Deputy Geister testified that the "ER doctor [at Aspen Valley Hospital] is considered to be surrogate for the jail doctor," who could be hard to reach at night and on weekends. (Pl.'s Med. Resp., SAF ¶ 18; *admitted at* Martinez Reply at

---

[4]I quote directly from Deputy Geister's deposition transcript due to Plaintiff's mischaracterization of his testimony. (*See* Pl.'s Med. Resp., RSAF ¶ 10 [citing Deputy Geister's deposition transcript for the proposition that he told Plaintiff "that if she didn't stop, he would call the hospital and arrange to have her sedated"].)

3–4.) Further, Deputy Geister admitted that it was Pitkin County's custom and practice to use the Aspen Valley Hospital as the medical arm of the jail as needed. (*Id.*) Deputy Geister also testified that when jail personnel thought sedation might be necessary, they had the option of calling either the jail doctor or the emergency room doctor. (*Id.*, Ex. 2 at 13 [Geister Dep.].) Deputy Geister "almost always" called the emergency room doctor. (*Id.*)

### a. The Paramedics Arrive

According to Paramedic Coniglio, at approximately 4:16 A.M., he and Parmedic Hutchinson (the "Paramedics") were dispatched to the Pitkin County Jail to evaluate a patient who was purportedly exhibiting an "altered level of consciousness (non-trauma)."[5] (*Id.*, Ex. 9 ¶ 2 [Coniglio Decl.].) Plaintiff testified that about ten minutes after her last encounter with Officer Davis, he and Officer Calvano appeared in her cell with the Paramedics. (Aspen Defs.' Br., SOF ¶ 19; *admitted at* Pl.'s Aspen Resp., RSOF ¶ 19.) Paramedic Hutchinson testified that the officers did not request that the Paramedics administer any type of medication and that paramedics "do not take requests from police officers regarding medical care." (*Id.*) Deputy Geister, however, testified that he lobbied the Paramedics for Plaintiff's sedation. (Pl.'s Med. Resp., Ex. 2 at 10 [Geister Dep.].) On the way to Plaintiff's cell, jail personnel informed the Paramedics that Plaintiff had been out of control, combative, and throwing herself against the cell door for quite some time. (Med. Defs.' Br., SOF ¶ 5; *admitted in relevant part at* Pl.'s Med. Resp., RSOF ¶ 5.) Jail

---

[5]Although Plaintiff denies that she was, in fact, exhibiting an "altered level of consciousness," she does not deny that the Paramedics were dispatched to evaluate her on that basis. (*See* Pl.'s Med. Resp., RSOF ¶ 5.)

personnel expressed concern that Plaintiff was going to hurt herself. (*Id.*) Further, they informed the Paramedics that the jail's sole restraint chair was already occupied by a violent male. (*Id.*)

Paramedic Hutchinson testified that he witnessed Plaintiff pounding her fists against her cell door and being "very vocal and shouting obscenities." (*Id.*, SAF ¶ 12; *admitted at* Martinez's Reply at 3–4.) Plaintiff testified that she used her fists and possibly her feet to pound against her cell door as hard as she could without injuring herself. (*Id.*, Ex. 1 at 25–26 [Pl. Dep.].) Plaintiff testified that she did not throw her entire body against the door. (*Id.*) Paramedic Hutchinson's assessment of Plaintiff's mental status was "very upset." (*Id.*, SAF ¶ 12; *admitted at* Martinez's Reply at 3–4.)

Paramedic Coniglio testified that he entered Plaintiff's cell and requested to take her vital signs. (Med. Defs.' Br., SOF ¶ 6; *admitted at* Pl.'s Med. Resp., RSOF ¶ 6.) In response, Plaintiff shouted obscenities at Paramedic Coniglio which enabled him to smell an alcohol-type odor on her breath. (*Id.*) Paramedic Coniglio testified that when he attempted to take Plaintiff's vital signs, Plaintiff became combative and scratched him. (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Med. Resp., RSOF ¶ 6.)

Plaintiff denies that she became combative with Paramedic Coniglio but admits that she "was trying to prevent whatever was going to be injected into me by literally any means possible." (*See id.*, SOF ¶ 8; *denied in relevant part at* Pl.'s Med. Resp, RSOF ¶ 8; *see also* Pl.'s Med. Resp., Ex. 1 at 11, 18 [Pl. Dep.].) Paramedic Coniglio asserts that he told Plaintiff that if she did not allow him to take her vital signs, he would have to take them without her consent to determine if she had a physical emergency. (Med. Defs.' Br., SOF ¶ 6; *admitted at* Pl.'s Med.

Resp., RSOF ¶ 6.)  Plaintiff plainly and repeatedly stated that she did not want medical treatment.
(Pl.'s Med. Resp., SAF ¶ 13; *admitted at* Martinez's Reply at 3–4.)  Paramedic Coniglio retreated
from Plaintiff's cell, but she did not calm down.  (*Id.*)  Paramedic Hutchinson testified that he
requested that law enforcement personnel restrain Plaintiff so that the Paramedics could perform a
medical assessment of her.  (Aspen Defs.' Br., SOF ¶ 20; *admitted at* Pl.'s Aspen Resp., RSOF ¶
20.)  With the aid of officers using force, as well as by placing Plaintiff in shackles and handcuffs,
Paramedics took Plaintiff's vital signs, which were normal.  (Med. Defs.' Br., SOF ¶ 6; *admitted
at* Pl.'s Med. Resp., RSOF ¶ 6.)

Paramedic Coniglio testified that due to what appeared to be Plaintiff's altered mental
status, he sought to obtain a blood drop from her to insure she was not having a diabetic reaction.
(*Id.*, SOF ¶ 7; *admitted in relevant part at* Pl.'s Med. Resp., RSOF ¶ 7.)  He was only able to
prick Plaintiff for this drop with the assistance of jail personnel restraining Plaintiff.  (*Id.*)
Paramedic Coniglio noted that Plaintiff's sentences were incomplete, that she was not making
sense at all times, that she had slurred speech, and that she had fits of combativeness.  (*Id.*)
Paramedic Coniglio was not able to assess Plaintiff's pupils because Plaintiff repeatedly closed her
eyes when he tried to look into her them.  (*Id.*)  The Paramedics saw no injury on Plaintiff.  (Pl's
Med. Resp., SAF ¶ 12; *admitted at* Martinez's Reply at 3–4.)

### b.  *Phone Call to Dr. Martinez*

After observing Plaintiff's behavior, Paramedic Coniglio contacted Dr. Martinez, the
emergency room physician at the Aspen Valley Hospital and relayed what he had observed and his
assessment of Plaintiff.  (Aspen Defs.' Br., SOF ¶ 21; *admitted in relevant part at* Pl.'s Aspen

Resp., RSOF ¶ 21.) At no point did Dr. Martinez have contact with law enforcement personnel. (Med. Defs.' Br., SOF ¶ 15; *deemed admitted at* Pl.'s Med. Resp., RSOF ¶ 15.)[6] When Dr. Martinez received the call from Paramedic Coniglio seeking medical direction on how to treat Plaintiff, she became Dr. Martinez's patient. (*Id.*, SOF ¶ 14; *admitted at* Pl.'s Med. Resp., RSOF ¶ 14.)

Paramedic Coniglio informed Dr. Martinez, among other things, that Plaintiff was resistive to medical evaluation, refused to come to the hospital emergency room for evaluation, was combative, refused to calm down, and was hurting herself by violently pounding and throwing herself against her cell door and by violently struggling against her handcuffs and shackles. (*Id.*, SOF ¶ 16; *deemed admitted at* Pl.'s Med. Resp., RSOF ¶ 16.)[7] At no time did Paramedic Coniglio suggest that Plaintiff be sedated. (*Id.*) During the course of his conversation with Paramedic Coniglio, Dr. Martinez became aware of the following: Plaintiff's age, sex, and weight; that Paramedic Coniglio had repeatedly observed Plaintiff slamming her fists and body against the cell door and screaming; reports by jail personnel that Plaintiff had been acting this way for some time and, at one point, had thrown her head and face against her cell door; that Plaintiff denied any chronic or current medical problems or illnesses; that Plaintiff denied taking any medications;

---

[6]Plaintiff fails to deny this assertion by Dr. Martinez, an assertion which find support in the record. (*See* Pl.'s Med. Resp., RSOF ¶ 15, Ex. 10 ¶ 7 [Martinez Decl.].) Thus, I deem Dr. Martinez's allegation admitted.

[7]Plaintiff admits that Dr. Martinez made this statement. (*See* Pl.'s Med. Resp., RSOF ¶ 16.) Plaintiff does not deny the truth of the statement. (*Id.*) Moreover, she provides no record evidence supporting a finding that Paramedic Coniglio failed to actually relay this information to Dr. Martinez. (*Id.*) Thus, I deem Dr. Martinez's allegation admitted.

that Plaintiff was healthy looking, awake, and had a strong odor of alcohol; that Plaintiff was uncooperative, would not allow the Paramedics to examine her to determine if she had any medical conditions, and closed her eyes when they tried to look at her pupils; that Plaintiff had no obvious signs of trauma; that Plaintiff admitted to drinking alcohol, but denied drug use; that Plaintiff's sentences were not complete, her speech was slurred, and she did not make sense at times; that Plaintiff was having fits of combativeness; that the Paramedics were unable to get a complete exam due to Plaintiff's combative behavior; that Plaintiff had attempted to claw at the Paramedics and pulled out some of her own hair; the Paramedics' assessment of Plaintiff as extremely intoxicated, agitated, and unable to control her behavior; that the Paramedics were concerned Plaintiff would harm herself given her inability to control her behavior; that Plaintiff was violently struggling against her restraints; that the jail's restraint chair was already occupied; and that the Paramedics were unable to calm Plaintiff down. (*Id.*, SOF ¶ 17; *deemed admitted at* Pl.'s Med. Resp., RSOF ¶ 17.)[8] Paramedic Coniglio also held the phone up so that Dr. Martinez could hear Plaintiff screaming and pounding on her cell door. (*Id.*)

Dr. Martinez formed the opinion that Plaintiff appeared to be suffering from non-psychotic agitation with acute alcohol intoxication. (*Id.*, SOF ¶ 18; *admitted in relevant part at* Pl.'s Med. Resp., RSOF ¶ 18.) Further, he exercised his professional medical judgment and determined that the situation at hand constituted a medical emergency and that Plaintiff was likely to hurt herself.

---

[8]Plaintiff admits that Dr. Martinez made these statements. (*See* Pl.'s Med. Resp., RSOF ¶ 17.) Plaintiff does not deny that Dr. Martinez in fact learned this information from the Paramedics. (*Id.*) Thus, I deem Dr. Martinez's allegation admitted.

(*Id.*)  It was his opinion that Plaintiff needed to be sedated to allow the Paramedics to determine if

Plaintiff had an acute emergency medical condition that was causing her behavior and to calm

Plaintiff down so that she would not dislocate her shoulder, fracture a bone, or sustain internal

injuries by throwing herself against her cell door.  (*Id.*)  Dr. Martinez stated that he was also

concerned Plaintiff was at risk of developing rhabdomyolysis, renal failure, or other complications

that could result in serious injury or death, due to her struggling violently against her physical

restraints and her inability to calm down.  (*Id.*)  According to Dr. Martinez, "for medical purposes

only and consistent with his medical judgment as to Plaintiff's best interest, [he] gave the medical

order to sedate Plaintiff with 10 milligrams of Droperidol."  (*Id.*)  Plaintiff denies any record

evidence that she was in danger of renal failure or death.  (Pl.'s Med. Resp., RSOF ¶ 18.)

### c. *Plaintiff is Sedated*

When Defendant Officer Calvano walked into Plaintiff's cell with the Paramedics to inject

her, she was sitting on the bed in shackles and handcuffs.  (*Id.*, SAF ¶ 35; *admitted at* Martinez's

Reply at 3–4.)  Plaintiff refused the injection, pleaded not to be injected, and asked Deputy

Geister for his name, stating that she intended to sue him.  (*Id.*, SAF ¶¶ 14–15, 17; *admitted at*

Martinez's Reply at 3–4.)  At the request of the Paramedics, Officer Calvano and Deputy Geister

physically restrained Plaintiff during the injection by forcing her head down on the bed while in

shackles and handcuffs.  (*Id.*)  In fear and panic, Plaintiff put her arm next to her head to keep

from being injected and was holding her hair.  (*Id.*, SAF ¶ 16; *admitted at* Martinez's Reply at

3–4.)  Defendant Officer Calvano admitted that she and a paramedic pried Plaintiff's arm away,

pulling some hair from her head in a clump which caused blood to run down Plaintiff's face.  (*Id.*)

Paramedic Coniglio testified that there was no question in his mind that Plaintiff was not in control of her behavior and would hurt herself if she did not calm down. (Med. Defs.' Br., SOF ¶ 7; *admitted at* Pl.'s Med. Resp., RSOF ¶ 7.) Defendant Officer Calvano also testified that the prospect of the injection "escalated" the situation and dramatically increased Plaintiff's distress. (Pl.'s Med. Resp., SAF ¶ 17; *admitted at* Martinez's Reply at 3–4.) Without Plaintiff's consent, Paramedic Coniglio then carried out Dr. Martinez's order to inject her with the Droperidol. (Med. Defs.' Br., SOF ¶ 19; *admitted at* Pl.'s Med. Resp., RSOF ¶ 19.) Plaintiff cried as she was being injected. (Pl.'s Med. Resp., SAF ¶ 17; *admitted at* Martinez's Reply at 3–4.)

Paramedics Coniglio and Hutchinson observed Plaintiff for approximately thirty to forty minutes after injecting her. (Med. Defs.' Br., SOF ¶ 20; *deemed admitted at* Pl.'s Med. Resp., RSOF ¶ 20.)[9] During that time, Plaintiff calmed down considerably and her handcuffs were removed by jail personnel. (*Id.*) Plaintiff continued to get out of bed and pound her arms against the door but with decreasing force. (*Id.*) Plaintiff eventually fell asleep on her cell bed. (*Id.*) The Paramedics evaluated Plaintiff a number of times by checking her vital signs and insuring all other obvious indicia of health were normal. (*Id.*, SOF ¶ 20; *admitted at* Pl.'s Med. Resp., RSOF ¶ 20.) Paramedic Coniglio called Dr. Martinez to let him know that Plaintiff appeared to be stable and was experiencing no acute medical issues. (*Id.*) Based upon Paramedic Coniglio's evaluation of

---

[9]Plaintiff admits that Dr. Martinez and Paramedic Coniglio made these statements and others in this paragraph. (*See* Pl.'s Med. Resp., RSOF ¶ 20.) Plaintiff does not explicitly deny the truth of the statement. (*Id.*) Further, Plaintiff provides no record evidence supporting a finding that the Paramedics failed to observe Plaintiff after injecting her. (*Id.*) Thus, I deem Dr. Martinez's allegation admitted.

Plaintiff, Dr. Martinez determined that there was no medical reason or indication that required Plaintiff to be brought to the hospital and that Plaintiff could be left in the custody of the jail. (*Id.*, SOF ¶ 21; *admitted at* Pl.'s Med. Resp., RSOF ¶ 21.) The Paramedics left the jail at 5:36 A.M. (*Id.*)

Subsequent physical exam revealed that the only physical injuries Plaintiff suffered that night were bruising and soreness from the injection, finger-mark bruises from being restrained so forcefully, and bruises and indentations on her wrists from tight handcuffs. (*Id.*, SAF ¶ 7; *admitted at* Martinez's Reply at 3–4.)

Plaintiff testified that she would have stopped beating on the door and yelling for a telephone call if someone had told to her that they would check on her daughter's safety. (*Id.*, SAF ¶ 8; *admitted at* Martinez's Reply at 3–4.) At some point after the Paramedics arrived, but prior to the injection, Plaintiff was informed that an officer was going to insure the safety of her child by going to Mr. Hawkins' residence and informing him that Plaintiff had been arrested and would be spending the night in jail. (Aspen Defs.' Br., SOF ¶ 18; *admitted at* Pl.'s Aspen Resp., RSOF ¶ 18.)

### d.    *Droperidol*

Droperdiol, the drug used to sedate Plaintiff, is most similar to the antipsychotic Haldol. (*Id.*, SAF ¶ 22; *admitted at* Martinez's Reply at 3–4.) Dr. Martinez acknowledged that this drug has received a "black box warning," which denotes the Food and Drug Administration's ("FDA") highest level of risk for an available prescription medication. (*See id.*, Ex. 3 at 12 [Martinez Dep.].) The FDA and the drug's manufacturer recommend that, given its potential for serious

adverse consequences — including death even below standard doses — Droperidol should be used only for postoperative nausea, and only where other drugs are judged to be ineffective. (*Id.*, SAF ¶ 23; *admitted at* Martinez's Reply at 3–4.) Alcohol is listed as an agent that interacts with Droperidol, and intoxication and female gender increase the risk for potentially fatal arrhythmia associated with the drug. (*Id.*, SAF ¶ 24; *admitted at* Martinez's Reply at 3–4.) On Dr. Martinez's order, the Paramedics injected Plaintiff with four times the manufacturer's maximum recommended dosage and twice the dosage prescribed in Dr. Martinez's own training protocol. (*Id.*, SAF ¶ 26; *admitted at* Martinez's Reply at 3–4.)

Dr. Martinez, as well as two emergency doctors who he has proffered as expert witnesses, dispute that Droperidol should only be used for post-operative nausea. (*See* Pl.'s Med. Resp., Ex. 3 at 5 [Martinez Dep]; Med. Defs.' Br., Ex. D at 9 [Expert Disclosure I], Ex. E. at 6 [Expert Disclosure II].) Instead, all three doctors opined that based on their research and lengthy experience, Dr. Martinez's off-label use of Droperidol in the dosage he ordered was entirely appropriate under the circumstances. (*See* Pl.'s Med. Resp., Ex. 3 at 5 [Martinez Dep]; Med. Defs.' Br., Ex. D at 9 [Expert Disclosure I], Ex. E. at 6 [Expert Disclosure II].) They opined that Droperidol is safe, effective, and commonly used as a chemical restraint for treating violent behavior in a patient intoxicated with alcohol. (*See id.*) Dr. Martinez explained the dosage he recommended as follows:

> In this particular instance that we're talking about, I wanted an appropriate dose for [Plaintiff] that would quickly and efficiently take care of the problem — take care of the potential problems as I perceived them in her case.

And since she was resisting evaluation and resisting our attempts to adequately examine her, it seemed most reasonable not to try to do repeat attempts of medication if they were necessary. Instead, the most prudent choice at that particular time was to give the amount of medication in one dose that should adequately take care of the problem and at the same time be most beneficial for her condition.

(Pl.'s Med. Resp., Ex. 3 at 14 [Martinez Dep.]; *accord id.*, Ex. E at 6 [Expert Disclosure II].)

During the relevant time period, the Aspen Valley Ambulance District had adopted EMS System Prehospital Protocols to protect the rights of patients, to train its paramedics, and to insure proper conduct by medical personnel. (Med. Defs.' Br., SOF ¶ 9; *admitted at* Pl.'s Med. Resp., RSOF ¶ 9.) In December 2004, there was a protocol in place providing instruction on how to care for and treat a patient suspected of having an altered mental status. (*Id.*) This protocol included a requirement that the paramedics contact the emergency room physician on duty at the Aspen Valley Hospital's Emergency Department if there was a need to consider chemical restraint. (*Id.*) A second protocol dealt with the use of Droperidol to control non-psychotic agitation in patients with acute alcohol intoxication. (*Id.*, SOF ¶ 10; *admitted at* Pl.'s Med. Resp., RSOF ¶ 10.) This protocol provided instructions on when and how to use Droperidol, including a requirement that the paramedics contact the emergency room physician on duty at the Aspen Valley Hospital's Emergency Department for authorization and a medical order before administering the medication. (*Id.*) Also during the relevant time period, the Aspen Valley Hospital District and Dr. Martinez had in place a training program for paramedics with respect to these protocols. (*Id.*, SOF ¶ 11; *admitted at* Pl.'s Med. Resp., RSOF ¶ 11.) Dr. Martinez, as the Medical Advisor to the Aspen Valley Ambulance District, provided medical training to the

Paramedics on these protocols. (*Id.*, SOF ¶ 12; *admitted at* Pl.'s Med. Resp., RSOF ¶ 12.)

Defendant Sheriff Robert Braudis, who was not at the Pitkin County Jail during the night in question, testified that the policy of the Pitkin County Sheriff's Department is to leave the decision of whether or not to involuntarily sedate an inmate to paramedics who are guided by an advisor physician. (Pl.'s Med. Resp., SAF ¶ 30; *admitted at* Martinez's Reply at 3–4.) He also stated that his staff was trained to call the Paramedics when they believed an individual needed forcible medication, and that it would then become a medical decision as to whether or not to sedate. (*Id.*, Ex. 16 at 4 [Braudis Dep.].)

### e.      *Facts Relevant to State Action Question*

Aspen Valley Hospital is a governmental subdivision of the state of Colorado. (Med. Defs.' Br., SOF ¶ 1; *admitted at* Pl.'s Med. Resp., RSOF ¶ 1.) In December 2004, Paramedics Coniglio and Hutchinson were employees of the Aspen Valley Hospital District. (*Id.*, SOF ¶ 2; *admitted at* Pl.'s Med. Resp., RSOF ¶ 2.) They were among the paramedics who operated the ambulance and addressed calls for emergency medical services outside the Aspen Valley Hospital. (*Id.*) Dr. Martinez is a physician licensed to practice medicine in Colorado. (*Id.*, SOF ¶ 3; *admitted at* Pl.'s Med. Resp., RSOF ¶ 3.) He is board-certified in emergency medicine and has been practicing emergency medicine since 1982. (*Id.*) In December 2004, Dr. Martinez was self-employed. (*Id.*, SOF ¶ 4; *deemed admitted at* Pl.'s Med. Resp., RSOF ¶ 4.)[10] He contracted with

_____

[10]Plaintiff does not deny this allegation or any other allegation in paragraph four of Dr. Martinez's Statement of Facts. (*See* Pl.'s Med. Resp., RSOF ¶ 4.) The allegations in paragraph four are directly supported by Dr. Martinez's declaration. (*See* Med. Defs.' Br., Ex. B ¶¶ 1–2.). Absent a denial, I deem these allegations admitted.

Aspen Emergency Medicine, P.C. ("AEM"), to provide emergency medicine services to patients as requested by AEM. (*Id.*) AEM, in turn, had a contract with Aspen Valley Hospital District under which AEM agreed to provide emergency medicine physicians, such as Dr. Martinez, to staff the Emergency Department at Aspen Valley Hospital and to treat patients referred to the Emergency Department. (*Id.*) Dr. Martinez was not employed by, and did not directly contract with, the Pitkin County Jail or the Aspen Valley Hospital District to provide medical services to inmates detained or incarcerated in the jail. (*Id.*) He described himself as a "subcontractor" to Aspen Valley Hospital. (Pl.'s Med. Resp., RSAF ¶ 19; *admitted at* Martinez's Reply at 4.) In 2004, he was also the physician advisor for Aspen Valley Hospital Ambulance District, which was administered by the Aspen Valley Hospital District. (*Id.*; *see also* Med. Defs.' Br., Ex. B ¶ 3 [Martinez Decl.]) On the night in question, he was the physician on duty for the Emergency Department and was "the physician in charge of the patient (Plaintiff) that [his] paramedics were acting upon." (Pl.'s Med. Resp., RSAF ¶ 20; *admitted at* Martinez's Reply at 3–4; *see also id.*, Ex. 3 at 3 [Martinez Dep.].)

## 2.    *Procedural History*

On August 11, 2006, Plaintiff filed a complaint in this court alleging the following constitutional violations stemming from her involuntary sedation: (1) denial of due process by all Defendants in violation of the Fourteenth Amendment; (2) unreasonable seizure by all Defendants in violation of the Fourth Amendment; (3) constitutional failure to train by Defendants Police Chief Loren Ryerson, Sheriff Braudis, Aspen Valley Hospital, and Dr. Martinez; and (4) retaliation for Plaintiff's exercise of free speech in violation of the First Amendment by Officer

Davis, Officer Calvano, and Deputy Geister. (Compl. and Jury Demand [filed Aug. 11, 2006].)

On April 11, 2007, Medical Defendants filed a motion for summary judgment on all counts

against them. (Med. Defs.' Br.) On June 14, 2007, Plaintiff responded to the motion. (Pl.'s

Med. Resp.) On July 2, 2007, Dr. Martinez filed a reply in support of the motion. (Martinez's

Reply.) This matter is fully briefed and ripe for review.

## ANALYSIS

### 1.   *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant

summary judgment where "the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d

1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of

evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to

demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518

(citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in

the pleadings, but must instead designate "specific facts showing that there is a genuine issue for

trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). A fact in dispute is

"material" if it might affect the outcome of the suit under the governing law; the dispute is

"genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the

nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477

U.S. at 248). The court may consider only admissible evidence when ruling on a summary

judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th

Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most

favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d

1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.**      ***Evaluation of Claims***

Dr. Martinez contends he is entitled to summary judgment on all of Plaintiff's claims

against him because: (1) he is not a state actor; (2) his actions did not constitute a violation of

Plaintiff's Fourth or Fourteenth Amendment rights; and (3) his training and supervision of the

Paramedics was not constitutionally deficient. (*See* Med. Defs.' Br.) After briefly reviewing the

law of 42 U.S.C. § 1983 ("Section 1983"), I consider each of Dr. Martinez's arguments in turn.

Plaintiff brings all of her claims under Section 1983, which provides a remedy for

constitutional violations committed by state or private actors under color of state law. *See* 42

U.S.C. § 1983 (2006). Specifically, Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

*Id.* Thus, to establish a violation of Section 1983, Plaintiff must allege that: (1) Defendants acted

under color of state law to deprive her of a right, and (2) the right of which Defendants deprived

her was secured by the Constitution or the laws of the United States.  *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).  With these general considerations in mind, I address Dr. Martinez's arguments in further detail below.

### a.    Dr. Martinez as a State Actor

Dr. Martinez contends that all of Plaintiff's Section 1983 claims against him must fail because he is not a state actor.  (Med. Defs.' Br. at 16–18.)  He argues that, as a private physician providing emergency services to inmates, his decision to sedate Plaintiff cannot be fairly attributed to the State.  (*Id.*)  Plaintiff counters that Dr. Martinez assumed the function of a jail doctor by treating Plaintiff and, thus, acted under color of state law.  (Pl.'s Med. Resp. at 20–26.)

### i.    State Action Doctrine

"The traditional definition of acting under color of state law requires that the defendant in a [Section] 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotation marks omitted).  Under such circumstances, it can be said that the defendant's alleged constitutional violation is "fairly attributable to the state."  *Id.* (quotation marks omitted).

Determining whether particular conduct constitutes state action "frequently admits of no easy answer."  *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974).  Courts are to take a "flexible approach to the state action doctrine, applying a variety of tests to the facts of each case."  *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1448 (10th Cir. 1995).  The Tenth Circuit has recognized the applicability of four tests for determining whether state action

exists. *Id.* First, the close nexus test asks "'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" *Id.* (quoting *Jackson*, 419 U.S. at 351). Second, the symbiotic relationship test finds state action when "the [S]tate has 'so far insinuated itself into a position of interdependence' with the private party." *Id.* (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 [1961].) Third, under the joint action test, the court will find state action if "a private party is a 'willful participant in joint activity with the State or its Agents.'" *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 787, 764 [1966] [further internal quotation marks omitted]). Finally, the public functions test finds state action when "a private entity . . . exercises 'powers traditionally exclusively reserved to the State.'" *Id.* (quoting *Jackson*, 419 U.S. at 352).

Under the joint action test, a jail or prison physician acts under color of state law while exercising his responsibilities pursuant to state law. *Polk County v. Dodson*, 454 U.S. 312, 320 (1981) ("Institutional physicians assume an obligation to the mission that the State, through the institution, attempts to achieve."). Moreover, under the public functions test — the test at issue in the instant case — a private doctor who *contracts* with the State to provide medical care to inmates also acts under color of state law for the purposes of Section 1983 when undertaking his duties to treat inmates. *West*, 487 U.S. at 54–55. In *West*, the Supreme Court reasoned:

> The fact that the State employed respondent[-physician] pursuant to a contractual arrangement that did not generate the same benefits or obligations applicable to other 'state employees' does not alter the analysis. It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State. Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner. Contracting out

> prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights. The State bore an affirmative obligation to provide adequate medical care to [plaintiff-inmate]; the State delegated that function to respondent[-physician]; and respondent[-physician] voluntarily assumed that obligation by contract.

*Id.* at 55–56. The Court noted that a contrary holding would mean "'the state will be free to contract out all services which it is constitutionally obligated to provide and leave its citizens with no means for vindications of those rights, whose protection has been delegated to private actors, when they have been denied.'" *Id.* at 56 n.14 (quoting *West v. Atkins*, 815 F.2d 993, 998 [4th Cir. 1987]).

Moreover, the Court emphasized that the provision of services at a detention facility distinguished the relationship between the respondent-physician and the plaitniff-inmate from the ordinary physician-patient relationship. *Id.* at 57. The Court explained: "Respondent[-physician] carried out his duties at the sate prison within the prison hospital. That correctional setting, specifically designed to be removed from the community, inevitably affects the exercise of professional judgment." *Id.*

### ii. The Parties' Arguments

Dr. Martinez contends the majority of courts agree that he is not a state actor, because he is not employed or under contract with the State to render medical services to prison inmates. (Med. Defs.' Br. at 16–18.)  Further, he argues that because federal law required him to evaluate and stabilize Plaintiff once contacted by the Paramedics, his relationship with Plaintiff was involuntary and, thus, insufficient to establish him as a state actor.  (*See id.* at 17; Martinez's Reply at 12–13.)  Plaintiff counters, with the support of Fourth Circuit precedent, that a lack of contract with the state is no bar to finding state action on Dr. Martinez's part.  (*See* Pl.'s Med. Resp. at 20–26.)  Further, Plaintiff argues that under the public functions test, Dr. Martinez was clearly acting under color of state law when he ordered the Paramedics to forcibly sedate her. (*See id.*)

The Tenth Circuit has not yet addressed whether Section 1983 liability may extend to private physicians who have no direct contract with the State and provide emergency services to inmates.  In fact, based on the parties' briefing and this court's own research, the only circuit to have come close to addressing this issue is the Fourth Circuit in *Conner v. Donnelly*, 42 F.3d 220 (4th Cir. 1994).  In *Conner*, the court found that a private physician acted under color of state law when he treated an inmate outside of the prison on referral from the prison doctor, even though the doctor had no contract with the State to treat inmates.  42 F.3d 220.  The court began with the Supreme Court's ruling in *West* "that the provision of medical services to prison inmates is traditionally the exclusive prerogative of the state."  *Id.* at 224; *see West*, 487 U.S. at 55–56.  The Fourth Circuit concluded that the nature of the physician's employment relationship with the State

in no way affected this finding, because the "physician's *function* within the state system is the same" regardless. *Id.* at 225. Noting the *West* court's concern that a state agency should not be able to avoid constitutional liability by contracting out all services which it is constitutionally obligated to provide, the *Conner* court concluded that "it follows that the [S]tate should not be able to relieve itself of its constitutional duty to provide adequate medical treatment to those in custody by *not* contracting out its medical care and, instead, relying on informal relationships with physicians." *Id.* at 226 (citing *West*, 487 U.S. at 56). Plaintiff contends that the reasoning of *West* and *Conner* compels the conclusion that when Dr. Martinez ordered Plaintiff's forcible sedation, he did so under color of state law. (*See* Pl.'s Med. Resp. at 21–22.)

Dr. Martinez counters that the *Conner* court admits its holding conflicted with the majority of other (district) courts that had passed on the issue. (*See* Martinez's Reply at 6 [citing *Conner*, 42 F.3d at 223].) Further, he argues that the court "wrongly focused on the State's relationship with the inmate, holding that a private physician acts under color of state law whenever the physician treats an inmate regardless of the physician's actual relationship with the jail." (*Id.*) Dr. Martinez also distinguishes *Conner* by pointing out that it did not involve an emergency situation in which the doctor had no choice but to treat the inmate. (*See id.* at 6, 12–13.) Finally, he points the court to several district court cases requiring some kind of contractual or employment relationship between the physician and the State in order to find state action. (Med. Defs.' Br. at 16–17; Martinez's Reply at 7–11.)

Dr. Martinez proffers the district court case of *Sykes v. McPhillips*, 412 F. Supp. 2d 197 (N.D.N.Y. 2006), as "particularly instructive." (Med. Defs.' Br. at 17.) In *Sykes*, the plaintiff

filed suit under Section 1983 against the defendant-physician, alleging constitutional violations

arising from the delivery of emergency medical services at a private hospital to the plaintiff's

incarcerated decedent.  412 F. Supp. 2d 197.  Although the hospital had no contract with the

State, it had on several occasions provided the state detention facility with a letter stating that it

would treat inmates presented for care.  *Id.* at 199.  The defendant-physician was the only

emergency room physician attending patients at the time the inmate was presented for care, and

he worked at the hospital as an independent contractor.  *Id.*  The plaintiff-inmate argued that the

defendant-physician should be deemed a state actor because his medical group contracted to

provide emergency services to the hospital, and he should have known that the hospital regularly

treated inmates.  *Id.* at 203.  The court found no state action when "a physician engaged in a

single encounter with a prisoner presented for emergency treatment, which he was obligated

under law to provide," and which occurred outside of the prison context.  *Id.* at 204.  While

acknowledging that "it is probable that state actor status may be conferred through less than

express contracting," the court found no state action.  *Id.*  Dr. Martinez argues this, and other

district court cases suggesting the focus of the state action inquiry is on the relationship between

the physician and the State, bar a finding of state action in the instant case.  (*See* Med. Defs.' Br.

at 16–17; Martinez's Reply at 7–11.)  Although none of the cases identified by the parties is

wholly on point, I find much of *Conner*'s reasoning persuasive, as I discuss in more detail below.

### iii.        *Findings on State Action*

As an initial matter, for the reasons stated in *Conner*, I hold a contractual relationship

between a physician and the State is *not* required in order to find a physician acts under color of

state law when treating an inmate.  42 F.3d at 225.  I agree with Fourth Circuit that nothing in *West* suggests that a physician must have a direct contractual relationship with the State in order to establish state action.  *See id.*  Instead, the Court makes clear that "[i]t is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State."  487 U.S. at 55–56.  The *Conner* court further explained:

> Regardless of whether the private physician has a contractual duty or simply treats a prisoner without a formal arrangement with the prison, the physician's function within the state system is the same: the [S]tate authorizes the physician to provide medical care to the prisoner, and the prisoner has no choice but to accept the treatment offered by the physician.  Even where a physician does not have a contractual relationship with the [S]tate, the physician can treat a prisoner only with the [S]tate's authorization. . . .  The source of deprivation does not change because the physician has no contractual relationship with the [S]tate: the physician acts under color of state law because the state has incarcerated the prisoner and denied him the possibility of obtaining adequate medical care on his own.

42 F.3d at 225.  Even the *Sykes* court admits that "it is probable that state actor status may be conferred through less than express contracting."  412 F. Supp. 2d at 202.  Thus that Dr. Martinez did not contracted directly with the State to treat inmates does not bar a finding that when he treated Plaintiff, he was acting under color of state law.

Additionally, I find unpersuasive Dr. Martinez's argument that the relationship between the physician and the State should be the sole determining factor in deciding whether the physician is a state actor.  (*See* Martinez's Reply at 5.)  The *West* Court makes clear that "the dispositive issue concerns the relationship among the State, the physician, *and the prisoner*."  487 U.S. at 56.

Moreover, much of the analysis in *West* centers on the relationship between the prisoner and the State. The Court explained:

> If [physician-defendant] misused his power by demonstrating deliberate indifference to [plaintiff-inmate's] serious medical needs, the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish [plaintiff-inmate] by incarceration and to deny him a venue independent of the State to obtain needed medical care.

*Id.* at 55. Thus, determining whether Dr. Martinez is a state actor is not a mono-factored analysis of the relationship between the doctor and the State. Instead, under the caselaw cited by both parties, the state action question requires a multi-factored, flexible analysis, tailored to the specific facts of the case at hand. *See Gallagher*, 49 F.3d at 1447 ("The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case."). In *West*, for instance, the court found state action based on the relationship between the prisoner and the State, the physician's voluntary assumption of an obligation to provide medical care to inmates by contract, and the fact that the care at issue was provided in an institutional setting. *See* 487 U.S. at 55–57. The *Conner* court found that the inmate's inability to choose his own medical provider, considered along with the physician's voluntary assumption of care of a prisoner upon referral by the state, sufficient to constitute state action. 42 F.3d at 226. In finding no state action, the *Sykes* court considered the facts that the physician provided care to the inmate in the context of a private hospital, had not contracted with the State to provide care to inmates, and gave care he was required to give by law to the prisoner in question only one time and on an emergency basis. 412 F. Supp. 2d at 203–04. Thus, this court must proceed to a fact-specific analysis of the present case.

At the outset, I find that when Dr. Martinez ordered Plaintiff be sedated, he undertook a public function, because "the provision of medical services to prison inmates is traditionally the exclusive prerogative of the [S]tate." *Conner*, 42 F.3d at 224; *West*, 487 U.S. at 55–56; *see also Gallagher*, 49 F.3d at 1447. As in *West*, and virtually all inmate healthcare cases, in choosing to detain Plaintiff, the State "den[ied her] a venue independent of the State to obtain . . . medical care." *Id.* at 55. In authorizing Dr. Martinez to provide healthcare to Plaintiff, a detainee of the State, the State delegated its constitutional duty to provide adequate medical treatment to those in its custody. *See West*, 487 U.S. at 56. Under *West*, the State cannot, by choosing to delegate its constitutional duties to the professional judgment of others, thereby avoid all liability flowing from the attempted fulfillment of those duties under Section 1983. *Id.* at 56 n.14. The State's absolute control over a detainee's access to medical care, coupled with the State's constitutional responsibility to provide adequate necessary medical care to detainees weighs in favor of finding state action when the State authorizes a physician to provide medical care to a detainee. *Id.* at 55–56. As the *Conner* court noted, regardless of the contractual relationship between the physician and the State, "the [S]tate authorizes the physician to provide medical care to the prisoner, and the prisoner has no choice but to accept the treatment offered by the physician." 42 F.3d at 225. This lack of choice on the part of the detainee rings particularly true in the instant case, where Plaintiff attempted to refuse the medical care provided. Thus, the relationship between Plaintiff and the State ways in favor of a finding of state action.

Another factor that weighs in favor of finding state action is the fact that the medical care at issue was provided to Plaintiff in an institutional setting, which "inevitably affects the exercise

of professional judgment." *West*, 487 U.S. at 57; *Sykes*, 412 F. Supp. 2d at 201–202 (noting that "it is clear" that medical staff providing care inside a prison facility are state actors). For instance, the Paramedics could not, in attempting to calm Plaintiff without an injection, consider removing her from confinement, direct that she be allowed to personally check on her daughter, or demand that she be released, even if they perceived that such actions would have forestalled any need to chemically sedate Plaintiff. Moreover, Dr. Martinez had to consider those means of restraint available in the jail, rather than those means of restraint that may have been available at the hospital. (*See* Med. Defs.' Br., Ex. B ¶ 9 [Martinez Dec.] [noting Dr. Martinez considered the fact that the jail's restraint chair was occupied in deciding to sedate her chemically].) Based on the foregoing, it is likely that "the nonmedical functions of prison life . . . influence[d] the nature, timing, and form of medical care provided to" Plaintiff. *West*, 487 U.S. at 57. Thus, that Plaintiff's medical care was provided in a jail, rather than a hospital, militates in favor of a finding of state action.

Dr. Martinez's argument against a finding of state action centers on his relationship — or lack thereof — with the State. (*See* Med. Defs.' Br. at 16–18; Martinez Reply at 4–13.) As an initial matter, it is important to note that Dr. Martinez was not simply a private physician working for a private hospital. Although he did not contract directly with the State to provide medical services, he did contract *indirectly* with the State — through AEM — to provide such services. (Med. Defs.' Br., SOF ¶ 3; *admitted at* Pl.'s Med. Resp., RSOF ¶ 3.) This contract is not so indirect as to be meaningless, because it is through the contract that Dr. Martinez, in fact, worked

on a regular basis at Aspen Valley Hospital, which is indisputably a state hospital.  (*See id.*, SOF ¶¶ 1, 4; *admitted at* Pl.'s Med. Resp., RSOF ¶¶ 1, 4.)

Dr. Martinez, however, contends that because he was legally obligated to provide emergency medical care to any patient presented to him, including inmates, any treatment relationship with Plaintiff was essentially involuntary, and thus could not serve as a basis to find him a state actor.  (Martinez's Reply at 12–13.)  I recognize that several courts, including the *West* and *Conner* courts, have considered whether the relationship between the physician and the inmate was voluntary in deciding whether the physician's medical care was provided under color of state law.  *See West*, 487 U.S. at 56 (noting that physician-respondent-physician "voluntarily assumed" the obligation to provide medical services to inmates); *Conner*, 42 F.3d at 226 (finding that when the State "delegates" the duty to provide medical care to inmates "to a physician who voluntarily assumes that obligation, that physician acts under color of state law").  In the instant case, Dr. Martinez has presented  evidence that he was obligated by law to treat Plaintiff once contacted by the Paramedics.  (*See* Martinez's Reply at 12–13 [citing 42 U.S.C. § 1395dd].)  This court is not convinced, however, that the law requiring Dr. Martinez to provide medical care to individuals presented for emergency treatment mandates a finding that his provision of medical services to Plaintiff was involuntary.  After all, Dr. Martinez was admittedly a "subcontractor" for the emergency room of a state hospital.  (Pl.'s Med. Resp., RSAF ¶ 19; *admitted at* Martinez's Reply at 4.)  In that capacity, he was assured to come into contact with inmates from time to time.  For the purposes of this motion, however, I find Dr. Martinez's treating relationship with Plaintiff was involuntary, which militates against a finding of state action.

Nonetheless, under the specific facts of this case, I find any consideration of voluntariness is outweighed by one of the primary policy issues underlying *West* — that States not be permitted to avoid Section 1983 liability by delegating their constitutional obligations to private parties. 487 U.S. at 56 n.14. In the instant case, it is undisputed that the policy of the Pitkin County Sheriff's Department is to leave the decision of whether or not to involuntarily sedate an inmate to paramedics who are guided by an advisor physician. (*See* Pl.'s Med. Resp., RSAF ¶¶ 30–31; *admitted at* Martinez's Reply at 3–4.) Deputy Geister testified that Aspen Valley Hospital acts as a "medical arm" of the jail when the need arises. (*Id.*, Ex. 2 at 13 [Geister Dep.].) Further, according to Deputy Geister's undisputed testimony, when jail personnel felt sedation might be necessary, they had the "option" of either calling the jail doctor or the emergency room doctor at Aspen Valley Hospital. (*Id.*) Deputy Geister "almost always" chose to call the emergency room doctor because "[i]t's more direct." (*Id.*)

This undisputed testimony supports a finding that sedations at Pitkin County Jail often occur under the authorization and supervision of an Aspen Valley Hospital emergency room doctor, such as Dr. Martinez. Moreover, Dr. Martinez has made clear that AEM contracted to provide emergency medicine *physicians* (meaning more than one), to the Emergency Department at Aspen Valley Hospital. (Med. Defs.' Br., SOF ¶ 4; *admitted at* Pl.'s Med. Resp., RSOF ¶ 4.) Thus, this court may reasonably infer that Pitkin County Jail emergency sedations have a reasonable chance of being authorized by a physician whose relationship with the State is akin to that of Dr. Martinez. If I were to find Dr. Martinez was not a state actor here, Pitkin County Jail's policy of delegating many decisions to sedate detainees and inmates to Aspen Valley

Hospital's Emergency Room, which is staffed at least in part by AEM physicians, would effectively serve to insulate the State from any liability for constitutional harms flowing from these sedations. This is exactly the kind of result the Supreme Court sought to avoid in *West*. 487 U.S. at 56 n.14. Accordingly, under the narrow facts of this case, I find that Dr. Martinez's decision to involuntarily sedate Plaintiff while in the confines of Pitkin County Jail was "fairly attributable to the state" and, thus, under color of state law. *Id.* at 49 (quotation marks omitted). Thus, I proceed to Dr. Martinez's arguments regarding Plaintiff's Fourth and Fourteenth Amendment claims against him.

b.      *Due Process*

i.       *Involuntary Sedation Principles*

It is well-established that "the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," thus, triggering the protections of the Due Process Clause. *Washington v. Harper*, 494 U.S. 210, 229 (1990). In *Harper*, the Supreme Court found that "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) (citing *Harper*, 494 U.S. at 229). In *Riggins*, the Court found that "[t]he Fourteenth Amendment affords at least as much protection to persons the State detains for trial." *Id.* In reaffirming this precept, the Court found that the injection of antipsychotic drugs compromises a person's liberty in a "particularly severe" way. *Id.* at 134. The Court in *Harper* and *Riggins* did not have before it, and did not address, what process might be required before state prison authorities may administer an antipsychotic drug in

-32-

an emergency circumstance, as opposed to regularly in the course of ongoing, long-term treatment. *See Harper*, 494 U.S. at 246–47 (Stevens, J. dissenting). Since the Supreme Court's decision in *Harper*, neither the Supreme Court nor the Tenth Circuit has addressed what due process is required to sedate a detainee in emergency circumstances.

Prior to *Harper*, however, the Tenth Circuit had already addressed this issue to some degree in *Bee v. Greaves*, 744 F.2d 1387 (10th Cir. 1984). In *Bee*, the court explicitly held that "a pretrial detainee retains a liberty interest derived from the Constitution in avoiding unwanted medication with [antipsychotic] drugs." 744 F.2d at 1394. The court based its holding, in part, upon the "undisputed nature of antipsychotic drugs," which "have the capacity to severely and even permanently affect an individual's ability to think and communicate." *Id.* at 1393–94. Nonetheless, the court found that, even absent a hearing, forced antipsychotic medication on a pretrial detainee may be appropriate when the State makes a showing that "treatment with [such] medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of [the detainee's] own safety or the safety of others." *Id.* at 1395.

Based on the foregoing authority, Plaintiff clearly retains a protected liberty interest in avoiding unwanted medication. This conclusion does not end the court's inquiry. Plaintiff's liberty interest "must be balanced against competing state interests to determine whether it is outweighed by 'the demands of an organized society.'" *Id.* at 1394 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 320 [1982]). The only competing state interest the Tenth Circuit has explicitly recognized that may be sufficient to overcome a pre-trial detainee's liberty interest in avoiding unwanted antipsychotic medication without a hearing is an emergency that threatens the

safety and security of jail occupants. *Id.* at 1395–96. The court was careful to note, however, that "[a]bsent an emergency, . . . [it] did not believe forcible medication with antipsychotic drugs is reasonably related to the concededly legitimate goals of jail safety and security." *Id.* at 1395 (internal quotations and citation omitted).

> Further, according to the court:

> Determining that an emergency exists sufficient to warrant involuntary medication with this type of drug requires a professional judgment-call that includes a balancing of the jail's concerns for the safety of its occupants against a detainee's interest in freedom from unwanted antipsychotics. Any decision to administer antipsychotic drugs forcibly must be the product of professional judgment by appropriate medical authorities, applying accepted medical standards. It requires an evaluation in each case of all the relevant circumstances, including the nature and gravity of the safety threat, the characteristics of the individual involved, and the likely effects of particular drugs.

*Id.* at 1395–96 (internal citations omitted). In making this evaluation, the decisionmaker should consider the availability of less restrictive alternatives to antipsychotic sedation, "such as segregation or the use of less controversial drugs like tranquilizers or sedatives." *Id.*

### ii. *Dr. Martinez's Alleged Due Process Violation*

Dr. Martinez contends that, based on the evidence before him, he made a proper professional judgement-call that a medical emergency existed warranting forcible sedation. (Med. Defs.' Br. at 21–28.) Plaintiff counters that a contested issue of material fact remains as to whether a medical emergency existed, thus, barring summary judgment. (Pl.'s Med. Resp. at 26–37.)

As an initial matter, I find that sedation with antipsychotic medication may be proper in an emergency situation even without a hearing. Plaintiff has pointed to no cases holding to the

-34-

contrary. Moreover, the *Bee* court's analysis, as discussed above, supports this finding. *See* 744 F.2d at 1393–96. Finally, I find the Fourth Circuit's opinion on this issue in *Hogan v. Carter*, 85 F.3d 1113 (1996), persuasive. In *Hogan*, an emergency doctor, without a hearing, ordered the forced sedation of an inmate who had been "talking loudly and beating on his cell door in such a way that [he] could injure [himself] as a result of the kicking and banging on [his] door[] with [his] fists." *Id.* at 1114 (internal quotations omitted). The court found no due process violation because the doctor, "consistent with accepted professional judgment [decided] that it was in [the inmate's] medical interest to receive the one-time dose of [antipsychotic] in order to protect [the inmate] from imminent, self-inflicted harm." *Id.* at 1116. The court explained:

> If, in the context of prolonged treatment [as in *Harper*], an inmate may be involuntarily medicated with an antipsychotic drug if a medical professional determines such medication to be in the inmate's best medical interests, then *a fortiori* the [S]tate retains the authority to administer such a drug in an emergency situation based upon the same medical judgment. To the extent that *Harper* can be read as constitutionally requiring full independent review of a medical judgment before administering an antipsychotic drug, we believe that such a holding would be properly understood as addressed to the circumstance of long-term treatment there at issue, and not as extending to emergencies. Otherwise, the state would be obliged, as the district court would have here required, to convene full-scale adversary proceedings at the any hour of the night, appoint and retain counsel, subpoena witnesses, and allow for cross-examination — all while the very inmates for whose protection the state is constitutionally responsible remain in danger of injury at their own hands.

*Id.* at 1117. I agree.

Thus, I now turn to the question of whether Dr. Martinez properly assessed the existence of a medical emergency warranting forcible sedation. *Bee* makes clear that whether an emergency exists sufficient to warrant sedation is a "professional judgment-call" to be undertaken by medical

professionals rather than law enforcement officials. *See* 744 F.2d at 1395–96. To properly find an emergency existed warranting forcible sedation, Dr. Martinez must have exercised reasonable medical judgment in determining that Plaintiff was likely to injure herself or others and that no effective, alternative, less-restrictive means of restraint were available. *See id.* at 744 F.2d at 1393–96.

Dr. Martinez argues his decision to sedate Plaintiff in order to protect her from injuring herself was medically justified by the facts that Plaintiff appeared highly intoxicated and out of control, was pounding and throwing her body against her cell door, was violently pulling against her restraints and thrashing about, and was unable to gain control in the presence of the Paramedics or allow her vital signs to be taken. (Med. Defs.' Br. at 27–28.) In support, Dr. Martinez proffers two expert witness disclosures, one by W. Peter Vellman, M.D., who was Medical Director of Emergency Services at St. Anthony Hospital in Denver, Colorado, for fifteen years, and one by Laurence W. Brooks, M.D., who has been practicing emergency medicine since 1973. (*See id.*, Ex. D [Expert Disclosure I], Ex. E [Expert Disclosure II].) After reviewing all relevant medical documents, law enforcement reports, and legal depositions, the doctors concluded that Dr. Martinez made an independent and proper medical decision to sedate Plaintiff with an appropriate amount of Droperidol in order to protect Plaintiff from injuring herself. (*See id.*, Ex. D at 7–10 [Expert Disclosure I], Ex. E at 4–9 [Expert Disclosure II].) Plaintiff proffers no medical opinion to the contrary and, instead, argues — apparently based solely on her lay opinion and an FDA warning which does not address off-label use of Droperidol— that Dr. Martinez's medical judgment was incorrect. (*See* Pl.'s Med. Resp.)

-36-

As an initial matter, I note that under the Federal Rules of Evidence, Plaintiff's lay opinion testimony regarding Dr. Martinez's medical judgment as well as the import of the FDA warning would almost certainly be inadmissible. *See* Fed. R. Evid. 701 (2008) (Lay opinion testimony is limited to "those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.); *see also World of Sleep*, 756 F.2d at 1474 (noting that the court may consider only admissible evidence when ruling on a summary judgment motion). Additionally, considering that the decision of whether or not a medical emergency exists warranting sedation of an inmate is indisputably a medical judgment to be made by medical professionals, *Bee*, 744 F.2d at 1395–96, and in light of the medical opinions supporting Dr. Martinez's medical judgment that an emergency existed because Plaintiff was a danger to herself and that the medicine and dosage chosen by Dr. Martinez was appropriate (*see* Med. Defs.' Br., Ex. D at 7–10 [Expert Disclosure I], Ex. E at 4–9 [Expert Disclosure II]), I find Plaintiff's lay opinion to the contrary and Plaintiff's proffered FDA warning are insufficient to create a disputed issue of fact regarding Dr. Martinez's professional judgment-call. *See Brown v. United States*, 74 F. App'x 611, 613–14 (7th Cir. 2003) (finding that in determining whether administration of analgesics was based on reasonable medical judgment, "[t]he knowledge of a medical expert far outmatches that of a common layman"); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (noting that courts, several States, and the FDA recognize the value and propriety of off-label use).

Nonetheless, Plaintiff contends that Dr. Martinez relied on incorrect — or at least disputed — facts in making the medical decision to sedate Plaintiff. (Pl.'s Med. Resp. at 30.) For instance, according to Plaintiff, Dr. Martinez relied on false reports that Plaintiff was banging her head and her body — rather than simply her fists and feet — against her cell door. (*Id.*) Plaintiff, however, has presented no evidence that Dr. Martinez himself misrepresented facts upon which he relied in deciding to sedate Plaintiff, nor has Plaintiff presented evidence that Dr. Martinez had any reason to disbelieve the facts as presented to him by the Paramedics. (*See* Pl.'s Med. Resp. at 26–37.) Thus, Plaintiff has presented no evidence to suggest that, based on the facts before him, Dr. Martinez's medical judgment was flawed.

Finally, Plaintiff argues that Dr. Martinez failed to adequately consider alternative, less-restrictive means of restraint. (*See id.* at 34–35.) Here, there is undisputed evidence that Dr. Martinez considered that the jail's sole restraint chair was in use by a violent male during the night in question. (*See id.*, Ex. 11 ¶ 9 [Martinez Decl.].) Still, Plaintiff argues that the doctor failed to consider whether Plaintiff should have been placed in the jail's isolation cell. (*Id.* at 36.) I would find any such oversight harmless, because Plaintiff does not dispute that the jail's sole isolation cell was in use during the night in question. (*See* Pl.'s Med. Resp.; *see also id.*, Ex. 2 at 3–4 [Geister Dep.].) Thus, any error in failing to *ask* about the cell could not have ultimately had a causal affect on Dr. Martinez's decision to sedate Plaintiff. *Joseph v. Shepherd*, 211 F. App'x 692, 703 (10th Cir. 2006) (noting that Section 1983 requires a plaintiff to show that defendant's actions *caused* a constitutional violation). Based on the foregoing, I find Plaintiff has failed to establish a genuine issue of material fact as to whether Dr. Martinez's medical judgment that an

emergency existed warranting sedation was proper given the information before him. Thus, I grant summary judgment in favor of Dr. Martinez on Plaintiff's Fourteenth Amendment claim.

### c.  *Fourth Amendment*

Dr. Martinez contends that restraint and injection of a detainee in the context of an emergency does not constitute a "seizure" cognizable under the Fourth Amendment. (Med. Defs.' Br. at 18–19.) Plaintiff contends that because there is a disputed issue of fact as to whether sufficient evidence existed to allow Dr. Martinez to conclude Plaintiff was a danger to herself, the forcible restraint and injection of Plaintiff was an unreasonable seizure. (*See* Pl.'s Med. Resp. at 37–42.) Plaintiff does not argue that the Paramedics, under Dr. Martinez's direction, used more force than necessary to effectuate the injection. (*Id.*) Without deciding whether forcible restraint and injection of antipsychotic medication is a seizure for Fourth Amendment purposes, I find that because Plaintiff has failed to demonstrate a disputed issue of material fact regarding Dr. Martinez's medical judgment that Plaintiff was likely to injure herself, her unreasonable seizure argument necessarily fails. (*See Analysis* § 2b, *supra.*) Thus, I grant summary judgment in favor of Dr. Martinez on Plaintiff's Fourth Amendment claim.

### d.  *Failure to Train*

Finally, Dr. Martinez argues summary judgment is warranted on Plaintiff's constitutional failure to train claim against him. (*See* Med. Defs.' Br. at 31–33.) Plaintiff counters that the doctor's failure to train his paramedics on the constitutional parameters of forced injections is actionable. (*See* Pl.'s Med. Resp. at 42–44.) To succeed on a failure to train claim under Section 1983, Plaintiff must put forth evidence showing that "the failure to train amounts to a deliberate

indifference to the rights of persons with whom [the paramedics] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). In the instant case, undisputed evidence supports a finding that the Paramedics were trained in a protocol which required paramedics, when they encounter a patient whom they perceive to have an altered mental status, to contact the emergency medical physician on duty at the hospital to determine if there was a need to consider chemical restraint. (*See* Med. Defs.' Br., Ex. B–2 at 8–9 [Protocols]; *see id.*, SOF ¶¶ 9–12; *admitted in relevant part at* Pl.'s Med. Resp., RSOF ¶¶ 9–12.) Thus, the protocol required that the emergency room physician, rather than the paramedics, decide whether chemical restraint was appropriate. (*See* Med. Defs.' Br., Ex. B–2 at 8–9 [Protocols].) In the instant case, all evidence supports a finding that Dr. Martinez, rather than the Paramedics, made an independent medical judgment as to whether or not to sedate Plaintiff. (Pl.'s Med. Resp., Ex. 10 ¶ 10 [Martinez Decl.], Ex. 9 ¶¶ 8–9 [Coniglio Decl.].) Plaintiff has simply failed to explain how a protocol that directed paramedics to call an emergency room physician to determine whether or not to sedate an inmate in any way shows a deliberate indifference to that inmate's constitutional rights. To the contrary, such a protocol comports with the Tenth Circuit's holding in *Bee* that "[a]ny decision to administer antipsychotic drugs forcibly must be the product of professional judgment by appropriate medical authorities." *Bee*, 744 F.2d at 1395–96 (internal citations omitted). Accordingly, I grant summary judgment in favor of Dr. Martinez on Plaintiff's failure to train claim.

### 3. Conclusion

Based on the foregoing it is therefore ORDERED that the Medical Defendants motion for summary judgment is GRANTED with respect to Dr. Martinez.

Dated this 29th day of February, 2008.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge