IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–01592–EWN–KLM

BRONWYN ANGLIN,

      Plaintiff,

v.

CITY OF ASPEN, COLORADO, a municipality,
LOREN RYERSON, CHIEF OF POLICE, in his official and individual capacity,
ASPEN POLICE OFFICER MELINDA CALVANO, in her official and individual capacity,
ASPEN POLICE OFFICER DAN DAVIS, in his official and individual capacity,
PITKIN COUNTY COMMISSIONERS, in their official and individual capacities,
PITKIN COUNTY SHERIFF ROBERT BRAUDIS, in his official and individual capacity,
PITKIN COUNTY DEPUTY SHERIFF WALT GEISTER, in his official and individual
capacity,
DOCTOR CHRIS MARTINEZ,

      Defendants.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

      This is a civil rights case in which Plaintiff Brownyn Anglin alleges Defendants violated

her rights to due process and free speech, as well as her right to be free from unreasonable

seizure, by forcibly injecting her with antipsychotic medication while in custody at the Pitkin

County Jail. This matter is before the court on "Defendants Pitkin County Commissioners,

Robert Braudis, and Walt Geister's Brief in Support of Motion for Summary Judgment," filed

April 11, 2007. Two other summary judgment motions are currently pending before the court in

this case. The instant motion is brought solely by the Defendants associated with Pitkin County,

which include Piktin County Commissioners, Pitkin County Sheriff Robert Braudis, and Pitkin

County Deputy Sheriff Walt Geister (hereinafter collectively "County Defendants"). Jurisdiction

is premised upon the existence of a federal question pursuant to 28 U.S.C. §§ 1331 and 1343.

## FACTS

### *1. Factual Background*

On the evening of December 11, 2004, Plaintiff and her four-year-old daughter attended a

dinner party at the apartment of her friend, Amber Nespeca. (Defs. Pitkin County Comm'rs,

Robert Braudis, and Walt Geister's Br. in Supp. of Mot. for Summ. J. [hereinafter "Defs.' Br."],

Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 1 [filed Apr. 11, 2007]; *admitted*

*at* Resp. to Pitkin County Defs.' Mot. for Summ. J. [hereinafter "Pl.'s Resp."], Resp. to

Statement of Undisputed Material Facts [hereinafter "RSOF"] ¶ 1 [filed June 14, 2007].) Kevin

Dunkleburg, Ms. Nespeca's boyfriend, also attended the party. (*Id.*) Over the course of the

evening, Plaintiff consumed four to five glasses of wine. (*Id.*, SOF ¶ 2; *admitted at* Pl.'s Resp.,

RSOF ¶ 2.) During the party, Ms. Nespeca and Mr. Dunkleburg became embroiled in an

argument, and Plaintiff witnessed Mr. Dunkleburg hitting Ms. Nespeca. (*Id.*, SOF ¶¶ 3–4;

*admitted at* Pl.'s Resp., RSOF ¶¶ 3–4.) Out of concern for Ms. Nespeca, Plaintiff called 9-1-1,

and Defendants Aspen Valley Police Officers Melinda Calvano and Ron Fabrocini, as well as

Officer Dan Davis were dispatched to the scene. (*Id.*, SOF ¶¶ 4–5; *admitted at* Pl.'s Resp., RSOF

¶¶ 4–5.) Upon arrival, the police arrested Ms. Nespeca. (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Resp.,

RSOF ¶ 6.) Plaintiff was shocked at Ms. Nespeca's arrest, because she thought Mr. Dunkleburg

should have been arrested instead. (*Id.*)

Ms. Nespeca was then taken to Pitkin County Jail. (*Id.*, SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.) At around 1:00 A.M., Plaintiff arrived at the jail in an effort to secure Ms. Nespeca's release. (*Id.*, SOF ¶ 10; *admitted at* Pl.'s Resp., RSOF ¶ 10.) Defendant Deputy Walt Geister, who was working at the jail teller window when Plaintiff arrived, informed her that Ms. Nespeca would need to post a $250 bond in order to be released. (*Id.*, SOF ¶¶ 9–10; *admitted at* Pl.'s Resp., RSOF ¶¶ 9–10.) Deputy Geister then allowed Ms. Nespeca to come to the teller window to give Plaintiff her ATM card and PIN number so that Plaintiff could obtain sufficient funds to bond Ms. Nespeca out of jail. (*Id.*, SOF ¶ 11; *admitted at* Pl.'s Resp., RSOF ¶ 11.) Plaintiff left the jail and returned a short time later with the funds. (*Id.*, SOF ¶ 12; *admitted at* Pl.'s Resp., RSOF ¶ 12.) When Plaintiff arrived, Officer Fabrocini was in the booking room with Deputy Geister. (*Id.*, SOF ¶ 14; *admitted at* Pl.'s Resp., RSOF ¶ 14.) When Officer Fabrocini saw Plaintiff enter the jail, he told Deputy Geister that Plaintiff had been present when Ms. Nespeca was arrested and that the only reason she had not also been arrested for interfering with Ms. Nespeca's arrest was because Plaintiff's young daughter was present with her at the time. (*Id.*, SOF ¶ 14; *admitted at* Pl.'s Resp., RSOF ¶ 14.) Further, Officer Fabrocini stated that Plaintiff was not a sober, responsible party. (*Id.*) Deputy Geister then told Plaintiff that she could leave the bond money but that he had been informed by the police officers that she was not a sober, responsible party due to her actions at the arrest scene. (*Id.*, SOF ¶ 15; *admitted at* Pl.'s Resp., RSOF ¶ 15.)

Plaintiff then went to the jail lobby and called 9-1-1 from her mobile phone in an attempt to get a county sheriff to help her bond Ms. Nespeca out of jail. (*Id.*, SOF ¶ 17; *admitted in*

*relevant part at* Pl.'s Resp., RSOF ¶ 17; *see also* Pl.'s Resp., Ex. 1 at 5–6 [Pl. Dep.].)  Plaintiff

was unsure how to reach a county sheriff at that time of night other than by calling 9-1-1.  (Pl.'s

Resp., Statement of Additional Disputed or Undisputed Facts [hereinafter "SAF"] ¶ 1; *admitted*

*at* Pitkin County Defs.' Reply in Supp. of Mot. for Summ. J [hereinafter "Defs.' Reply"], Resp.

Concerning Disputed Facts [hereinafter "RSAF"] ¶ 1[filed July 9, 2007].)  After being put on hold

for what Plaintiff believed to be approximately two minutes, she thought the dispatcher had lost

the call; so, she hung up and called 9-1-1 a second time.  (Defs.' Br., SOF ¶¶ 17–18; *admitted in*

*relevant part at* Pl.'s Resp., RSOF ¶¶ 17–18; *see also* Pl.'s Resp., Ex. 1 at 5 [Pl.'s Dep.].)  Again,

the dispatcher placed Plaintiff on hold for approximately two minutes, and, again, Plaintiff hung

up and called 9-1-1.  (Defs.' Br., SOF ¶ 18; *admitted at* Pl.'s Resp., RSOF ¶ 18.)

      The 9-1-1 dispatcher, in turn, called the jail booking room to report that Plaintiff's

repeated phone calls were tying-up the 9-1-1 system and had forced her to drop one legitimate

emergency call.  (*Id.*, SOF ¶ 20; *admitted at* Pl.'s Resp., RSOF ¶ 20.)  The dispatcher requested

that jail personnel do something to prevent Plaintiff from continuing to interfere with 9-1-1

operations.  (*Id.*)  Officers Calvano and Davis proceeded to the lobby and shackled and

handcuffed Plaintiff without warning.  (Pl.'s Resp., SAF ¶ 2; *admitted at* Defs.' Reply, RSAF ¶

2.)  Because all the other cells in the jail were already occupied by other inmates, Deputy Geister

decided to put Plaintiff in the jail's maximum security cell.  (Defs.' Br., SOF ¶ 23; *admitted at*

Pl.'s Resp., RSOF ¶ 23.)  Plaintiff struggled and had to be dragged to her cell, because she was

terrified by the thought of being placed in maximum security.  (Pl.'s Resp., SAF ¶ 2; *admitted at*

Defs.' Reply, RSAF ¶ 2.)  The maximum security cell was tiny, and Plaintiff is claustrophobic.

(*Id.*, SAF ¶ 3; *admitted at* Defs.' Reply, RSAF ¶ 2.)  The cell had a small, narrow window that prevented Plaintiff from seeing anyone outside it.  (*Id.*)

Before she was placed in her cell, Plaintiff asked several times to make a phone call to ensure her daughter was safe.  (*Id.*, SAF ¶ 4; *admitted at* Defs.' Reply, RSAF ¶ 4.)  Once Plaintiff was in her cell, Deputy Geister left to attend to other inmates and directed Officers Calvano and Davis to keep an eye on Plaintiff.  (Defs.' Br., SOF ¶ 24; *admitted at* Pl.'s Resp., RSOF ¶ 24.) Plaintiff began yelling out her request for a phone call in hopes that someone would hear her, since the cell door was thick steel.  (Pl.'s Resp., SAF ¶ 4; *admitted at* Defs.' Reply, RSAF ¶ 4.) Officer Calvano testified that she did not know what Plaintiff was yelling, but called it "intrusive to the inmates" and "obstructive" to jail staff.  (*Id.*, SAF ¶ 5; *admitted at* Defs.' Reply, RSAF ¶ 5.)  Plaintiff began pounding on her cell's door.  (*Id.*, SOF ¶ 25; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 25.)  After about ten minutes, Officer Davis reported to Deputy Geister that Plaintiff had been pounding on the door and expressed concern that Plaintiff might hurt herself. (*Id.*, SOF ¶ 26; *admitted at* Pl.'s Resp., RSOF ¶ 26; *see also* Pl.'s Resp., SAF ¶ 10; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 10.)  According to Plaintiff, Officer Davis came into her cell and told her to shut up or he would have her sedated.  (Pl.'s Resp., SAF ¶ 11; *admitted at* Defs.' Reply, RSAF ¶ 11.)  Deputy Geister testified that he told Plaintiff that if she continued to pound against the door "we're going to contact the hospital and see about sending the paramedics and having [you] sedated."[1]  (Pl.'s Resp., Ex. 2 at 6 [Geister Dep.].)

_____

[1] I quote directly from Deputy Geister's deposition transcript due to Plaintiff's mischaracterization of his testimony.  (*See* Pl.'s Resp., RSAF ¶ 10 [citing Deputy Geister's

Deputy Geister attempted to contact the emergency room physician, Defendant Chris Martinez, M.D., to discuss Plaintiff's behavior, but the deputy could not make contact. (Defs.' Br., SOF ¶ 27; *admitted at* Pl.'s Resp., RSOF ¶ 27.) As a result, Deputy Geister instructed dispatch to page paramedics to the jail. (*Id.*) Paramedics Damien Coniglio and Mark Hutchinson (the "Paramedics") were dispatched to the jail. (*Id.*) When the Paramedics arrived, Deputy Geister told them that Plaintiff was "combative" and had been banging her head. (*Id.*, SOF ¶ 28; *admitted at* Pl.'s Resp., RSOF ¶ 28.) Plaintiff testified that she used only her hands to bang on her cell door — never her head, arms, or body — and that she pounded as hard as she could on the door without hurting herself. (Pl.'s Resp., SAF ¶¶ 6–7; *admitted at* Defs.' Reply, RSAF ¶¶ 6–7.) Deputy Geister described his role *vis`a vis* the Paramedics as "argu[ing] the case [for sedation]." (*Id.*, SAF ¶ 29; *admitted at* Defs.' Reply, RSAF ¶ 29.) According to Deputy Geister, the Pitkin County Jail had "been sedating people for [eighteen years]," and at least two have been sedated since Plaintiff. (*Id.*, SAF ¶ 41; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 41.)

Paramedic Hutchinson testified that he saw Plaintiff pounding her fists against her cell door, being "very vocal and shouting obscenities." (*Id.*, SAF ¶ 12; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 12.) The Paramedics entered Plaintiff's cell with Officer Davis and evaluated Plaintiff while Deputy Geister was working on other matters at the jail. (Defs.' Br., SOF ¶¶ 29, 33; *admitted at* Pl.'s Resp., RSOF ¶¶ 29, 33.) Plaintiff plainly and repeatedly stated that she did not want medical treatment. (Pl.'s Resp., SAF ¶ 13; *admitted at* Defs.' Reply, RSAF

_____

deposition transcript for the proposition that he told Plaintiff "that if she didn't stop, he would call the hospital and arrange to have her sedated"].)

¶ 13.) With the aid of officers using force, as well as by placing Plaintiff in shackles and handcuffs, medics took Plaintiff's vital signs, which were normal. (*Id.*, SAF ¶¶ 13, 32; *admitted in relevant part at* Defs.' Reply, RSAF ¶¶ 13, 32.) Paramedic Hutchinson assessed Plaintiff as "very upset" and as having slurred speech. (*Id.*, SAF ¶ 12; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 12.) He also noted that she was "shouting obscenities." (*Id.*) Paramedics saw no injury on Plaintiff and did not witness the purported head-banging Deputy Geister claimed to have seen. (*Id.*, SAF ¶ 12; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 12.)

Paramedic Coniglio then called Dr. Martinez to discuss the information he had been given about Plaintiff's behavior that night, as well as his own observations of Plaintiff's behavior at the jail, his evaluation and examination of Plaintiff, and his concern that Plaintiff was hurting herself and creating a danger to herself and others. (Defs.' Br., SOF ¶ 29; *admitted at* Pl.'s Resp., RSOF ¶ 29.) Mr. Coniglio also held the telephone up so that Dr. Martinez could hear Plaintiff screaming and pounding on the door of her cell. (*Id.*, SOF ¶ 30; *admitted at* Pl.'s Resp., RSOF ¶ 30.) Dr. Martinez authorized the Paramedics to sedate Plaintiff. (*Id.*, SOF ¶ 31; *admitted at* Pl.'s Resp., RSOF ¶ 31.) After Dr. Martinez's authorization, the Paramedics approached Deputy Geister to inform him that they were going to sedate Plaintiff and that they would stay with Plaintiff until they knew that the sedative had taken effect and that she did not have any adverse effects. (*Id.*, SOF ¶¶ 33–34; *admitted at* Pl.'s Resp., RSOF ¶¶ 33–34.) The Paramedics asked Deputy Geister to assist them with restraining Plaintiff so that they could safely administer the sedative. (*Id.*, SOF ¶ 35; *admitted at* Pl.'s Resp., RSOF ¶ 35.) Deputy Geister agreed. (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Resp., RSOF ¶ 6.)

When the Paramedics walked into Plaintiff's cell to inject her, Plaintiff was sitting on her bed in shackles and handcuffs. (Pl.'s Resp., SAF ¶ 32; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 32.) Plaintiff pleaded not to be injected and asked Deputy Geister for his name, stating that she intended to sue him. (*Id.*, SAF ¶¶ 14, 17; *admitted in relevant part at* Defs.' Reply, RSAF ¶¶ 14, 17.) To assist in injecting Plaintiff, Officer Calvano pushed Plaintiff's face down on the bed so that she could be injected. (*Id.*, SAF ¶ 15; *admitted at* Defs.' Reply, RSAF ¶ 15.) Officer Calvano and Deputy Geister, as well as the Paramedics, used force to restrain Plaintiff for the injection as she lay face down in shackles and handcuffs. (*Id.*) In fear and panic, Plaintiff put her arm next to her head to keep from being injected and was holding her hair. (*Id.*, SAF ¶ 16; *admitted at* Defs.' Reply, RSAF ¶ 16.) Officer Calvano admitted that she and a paramedic pried Plaintiff's arm away, pulling some hair from her head in a clump which caused blood to run down Plaintiff's face. (*Id.*) Officer Calvano also testified that the prospect of the injection "escalated" the situation and dramatically increased Plaintiff's distress. (*Id.*, SAF ¶ 17; *admitted at* Defs.' Reply, RSAF ¶ 17.) Plaintiff cried as she was being injected. (*Id.*) About thirty minutes after Plaintiff's injection, the sedative began to take effect and Deputy Geister removed Plaintiff's restraints. (Defs.' Br., SOF ¶ 37; *admitted at* Pl.'s Resp., RSOF ¶ 37.)

Droperdiol, the drug used to sedate Plaintiff, is most similar to the antipsychotic Haldol. (Pl.'s Resp, SAF ¶ 18; *admitted in relevant part at* Defs.' Reply ¶ 18.) This drug has received a "black box warning," which denotes the Food and Drug Administration's highest level of risk for an available prescription medication. (*Id.*; *see also id.*, Ex. 6 at 3 [Martinez Dep.].) Alcohol is listed as an agent that interacts with Droperidol, and intoxication and female gender increase the

risk for potentially fatal arrhythmia associated with the drug. (*Id.*, SAF ¶ 20; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 20.) The Paramedics injected Plaintiff with four times the manufacturer's maximum recommended dosage and twice the dosage prescribed in Dr. Martinez's own training protocol. (*Id.*, SAF ¶ 22; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 22; *see also id.*, Ex. 6 at 5 [Martinez Dep.].)

Subsequent physical exam revealed that the only injuries Plaintiff suffered that night were bruising and soreness from the injection, finger-mark bruises from being restrained so forcefully, and bruises and indentation on her wrists from tight handcuffs. (*Id.*, SAF ¶ 7; *admitted at* Defs.' Reply, RSAF ¶ 7.)

Plaintiff testified that she would have stopped beating on the door and yelling for a telephone call if someone had told to her that they would check on her daughter's safety. (*Id.*, SAF ¶ 8; *admitted at* Defs.' Reply, RSAF ¶ 8.) Plaintiff was not told until paramedics were in her cell that an officer would make sure that her daughter was all right. (*Id.*) Deputy Geister testified that he usually allowed detainees to make a phone call. (*Id.*, SAF ¶ 9; *admitted at* Defs.' Reply, RSAF ¶ 9.) He also stated that he was not aware Plaintiff wished to call her child until he entered her cell with the Paramedics around 4:00 A.M. (*Id.*, Ex. 2 at 8 [Geister Dep.].) By that point, according to Deputy Geister, Plaintiff "had lost all credibility" with him. (*Id.*) He testified that did he not allow her to make a phone call, because doing so would only wake up her young daughter. (*Id.*)

At the time of Plaintiff's sedation, the jail's restraint chair and isolation cell were already occupied by other inmates. (Defs.' Br., SOF ¶ 36; *admitted at* Pl.'s Resp., RSOF ¶ 36.) Officer

-9-

Davis testified that the padded isolation cell was "typically used for really intoxicated people who may . . . hurt themselves." (Pl.'s Resp., SAF ¶ 33; *admitted at* Defs.' Reply, RSAF ¶ 33.) The padded cell was only partially padded, in that the windows, toilet, and door had no padding. (*Id.*, SAF ¶ 36; *admitted at* Defs.' Reply, RSAF ¶ 36; *see also id.*, Ex. 2 at 3–4 [Geister Dep.].) Acknowledging the deficiency of the padded cell, Deputy Geister testified that the jail's cells were designed for compliant inmates. (*Id.*, SAF ¶ 37; *admitted at* Defs.' Reply, RSAF ¶ 37.)

Sheriff Braudis, who was not at the Pitkin County Jail during the night in question, testified that the policy of the Pitkin County Sheriff's Department is to leave the decision of whether or not to involuntarily sedate an inmate to paramedics who are guided by a physician-advisor. (*Id.*, SOF ¶ 38; *admitted at* Pl.'s Resp., RSOF ¶ 38; *see also* Pl.'s Resp., RSAF ¶ 35; *admitted at* Defs.' Reply, RSAF ¶ 35.) He also stated that his staff was trained that when they believed an individual needed forcible medication, they were to call the Paramedics, and then it would become a medical decision as to whether or not to sedate. (*Id.*, Ex. 12 at 4 [Braudis Dep.].) Sheriff Braudis testified that he did not know what training, if any, paramedics had regarding inmates' constitutional rights when it came to forced injections. (Pl.'s Resp., SAF ¶ 25; *admitted at* Defs.' Reply, RSAF ¶ 25.)

Deputy Geister testified that when an inmate was "out of control," and the jail had no other means of restraining that individual, he understood that he had a right to page paramedics so that they could determine whether sedation was necessary. (*See id.*, Ex. 2 at 10–11 [Geister Dep.].) Deputy Geister was unaware of the source of medical authority to involuntarily sedate people. (*Id.*, SAF ¶ 27; *admitted at* Defs.' Reply, RSAF 27.) No Pitkin County Jail policies

prohibited deputies from lobbying medical personnel to sedate a detainee.  (*Id.*, SAF ¶ 31; *admitted at* Defs.' Reply, RSAF ¶ 31.)

Officer Calvano testified that she was trained that individuals have a right to refuse medical treatment but was not specifically trained on the circumstances under which forcible injection is permissible.  (*Id.*, Ex. 3 at 2 [Calvano Dep.].)  Further, Officer Calvano testified to her understanding that the decision of whether to inject a detainee "gets turned over to the Paramedics and the people in the medical profession.  It's not my responsibility to let them waive their medical rights or anything, because that's not my capacity of [sic] my job."  (*Id.*)

On a final note, Deputy Geister testified that, in rare instances, when the Pitkin County Jail needs extra help, it utilizes the Aspen Police Department as auxiliary deputy sheriffs.  (*Id.*, SAF ¶ 38; *admitted at id.*, Ex. 2 at 15 [Geister Dep.].)  The night of Plaintiff's injection, Deputy Geister did utilize the help of the Aspen Police Department at Pitkin County Jail.  (*Id.*, SAF ¶¶ 38–39; *admitted in relevant part at id.*, Ex. 2 at 15 [Geister Dep.].)

## 2.   *Procedural History*

On August 11, 2006, Plaintiff filed a complaint in this court alleging the following constitutional violations stemming from her involuntary sedation: (1) denial of due process by all Defendants in violation of the Fourteenth Amendment; (2) unreasonable seizure by all Defendants in violation of the Fourth Amendment; (3) constitutional failure to train by Police Chief Loren Ryerson, Sheriff Braudis, Aspen Valley Hospital, and Dr. Martinez; and (4) retaliation for Plaintiff's exercise of free speech in violation of the First Amendment by Officer Davis, Officer Calvano, and Deputy Geister.  (Compl. and Jury Demand [filed Aug. 11, 2006] [hereinafter

"Compl."].)  On April 11, 2007, County Defendants filed a motion for summary judgment, on all counts against them.  (Defs.' Br.)  On June 14, 2007, Plaintiff responded to the motion.  (Pl.'s Resp.)  On July 9, 2007, Defendants filed a reply in support of their motion.  (Defs.' Reply.)  This matter is fully briefed and ripe for review.

## ANALYSIS

### 1.    *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477

-12-

U.S. at 248).  The court may consider only admissible evidence when ruling on a summary

judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th

Cir. 1985).  The factual record and reasonable inferences therefrom are viewed in the light most

favorable to the party opposing summary judgment.  *Byers v. City of Albuquerque*, 150 F.3d

1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.      *Evaluation of Claims***

        County Defendants argue they are entitled to summary judgment on all claims against

them for the following reasons: (1) Defendants Pitkin County Commissioners should be dismissed

as a party because they are not liable for the acts of those Defendants who participated in forcibly

injecting Plaintiff; (2) Plaintiff's Fourth and Fourteenth Amendment claims fail as to Defendants

Sheriff Braudis and Deputy Geister because they did not personally participate in the decision to

sedate Plaintiff, and Plaintiff showed no unconstitutional custom, policy, or practice; (3) Plaintiff's

Fourth Amendment claim also fails because an involuntary injection is not cognizable as a

"seizure;" (4) Defendants Sheriff Braudis and Deputy Geister are entitled to qualified immunity on

Plaintiff's Fourth and Fourteenth Amendment claims; (5) Plaintiff's First Amendment claim

against Deputy Geister must fail because Plaintiff admits she has no evidence to support it; and (6)

Plaintiff has failed to proffer evidence of inadequate training by Sheriff Braudis.  (Defs.' Br.)

After briefly reviewing the law of  42 U.S.C. § 1983 ("Section 1983"), I consider Defendants'

arguments in turn.

Plaintiff brings all of her claims under Section 1983, which provides a remedy for constitutional violations committed by state or private actors under color of state law. *See* 42 U.S.C. § 1983 (2006). Specifically, Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.* Thus, to establish a violation of Section 1983, Plaintiff must allege that: (1) Defendants acted under color of state law to deprive her of a right, and (2) the right of which Defendants deprived her was secured by the Constitution or the laws of the United States. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Defendants do not address, and therefore necessarily do not dispute, that Defendants are state actors. (*See* Defs.' Br.; Defs.' Reply.) With these general considerations in mind, I address Defendants' arguments in further detail below.

### a.   *Defendants Pitkin County Commissioners as a Party*

County Defendants argue that because, under Colorado law, the sheriff, not Pitkin County Commissioners, is liable for the acts of his undersheriff and deputy sheriffs, Pitkin County Commissioners should be dismissed as a party. (Defs.' Br. at 8–9.) Plaintiff counters that Pitkin County Commissioners are liable for damages due to the unconstitutional forcible injection policy set by Sheriff Braudis. (*See* Pl.'s Resp. at 24–26.)

Section 1983 does not provide for liability under the theory of *respondeat superior*. *See Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000). However, municipal entities can be

sued for monetary, declaratory, or injunctive relief for deprivations of constitutional or civil rights under Section 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Meade v. Grubbs*, 841 F.2d 1512, 1525 (10th Cir. 1988) ("While an agency of the state may fall under the protective umbrella of the [Eleventh] Amendment, political subdivisions of the state do not."). Municipal liability is limited to deprivations of federally protected rights caused by actions taken pursuant to official municipal policy or custom and "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action taken." *Pembauer v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *accord Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).

As County Defendants point out, under Colorado law, the county sheriff is a separate and distinct position from the board of county commissioners. *Bristol v. Bd. of County Commn'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002) (citing COLO. CONST. art XIV, §§ 6, 8). Sheriffs retain exclusive control over the hiring, firing, and terms and conditions of employment of their employees. *Id.* "Because the [b]oard of county commissioners has no control over the [s]heriff's employees," the Tenth Circuit has determined that "the [b]oard is not liable for the negligent acts of the [s]heriff's employees." *Id.* Thus, argue County Defendants, the Pitkin County Commissioners cannot be held liable the for training, supervision, or acts of Sheriff Braudis' employees, who allegedly caused the constitutional violation at issue in this case. (Defs.' Br. at 8–9; Defs.' Reply at 20–21.)

County Defendants' argument misses the mark. The United States Supreme Court has made clear that "it is when execution of a government's policy or custom, whether made by its

lawmakers *or by those whose edicts or acts that may fairly be said to represent official policy*, inflicts the injury that the government as an entity is responsible under [Section] 1983." *Monell*, 436 U.S. at 694 (emphasis added). In concert with this holding, Plaintiff does not contend that Pitkin County Commissioners are directly liable for the *acts* of Sheriff Braudis' employees; she contends that Pitkin County Commissioners are liable for the *consequences* of Sheriff Braudis' *policy*, as set for Pitkin County, with regard to involuntary sedation of individuals in custody. (*See* Pl.'s Resp. at 24–26.) Thus, I find the Pitkin County Commissioners are an appropriate party to this suit.

Contrary to County Defendants' argument, *Bristol* is no bar to this conclusion. (*See* Defs.' Br. at 8–9.) *Bristol* addressed the limited issue of whether county commissioners were the "employer" of a sheriff's deputy for purposes of the Americans with Disabilities Act. *See* 312 F.3d at 1221. The court explicitly recognized that Section 1983 liability was not at issue in the case but, nevertheless, took pains to note that ample caselaw "suggest[ed] that counties can be held liable for the misdeeds of [s]heriffs and their employees when the [s]heriff is held to set 'official policy' for the county." 312 F.3d at 1221; *accord Gonzales v. Martinez*, 403 F.3d 1179, 1182 n.7 (10th Cir. 2005).

In the instant case, reading the facts in the light most favorable to Plaintiff, Sheriff Braudis sets the official policy relating to involuntary medication for Pitkin County. Defendant Braudis testified regarding Pitkin County Jail's involuntary sedation policy without objection to Plaintiff counsel's characterization of Sheriff Braudis' role as the individual who set "the official policy of Pitkin County" relating to involuntary sedation. (*See* Pl.'s Resp., Ex. 12 at 3–4 [Braudis Dep.]);

-16-

*see also* Colo. Rev. Stat. § 30–10–511 (2007) ("Except as provided in section 16–11–308.5, [Colo. Rev. Stat.], the sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself or through a deputy or jailer").

Thus, I find Pitkin County Commissioners cannot escape potential shared liability with Sheriff Braudis by arguing that he, alone, is responsible for the acts of his employees. *See St. Louis v. Praprotnick*, 485 U.S. 112, 126 (1988) (recognizing that if "a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, [Section] 1983 could not serve its intended purpose").

### b. *Fourth and Fourteenth Amendment Claims Against Deputy Geister and Sheriff Braudis in Their Individual Capacities*

#### i. *Qualified Immunity*

Defendants Sheriff Braudis and Deputy Geister argue they are entitled to summary judgment on Plaintiff's Fourth and Fourteenth Amendment claims against them in their individual capacities, because they did not personally participate in Plaintiff's forcible injection. (Defs.' Br. at 18–21.) They further contend that even if their actions resulted in a violation of Plaintiff's constitutional rights, they are entitled to qualified immunity because Plaintiff cannot establish that a reasonable officer in their position would have believed that their conduct violated the Fourth or Fourteenth Amendments. (*Id.*)

The doctrine of qualified immunity shields government officials from individual liability when they are performing discretionary functions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982); *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an *immunity from suit* rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (citations omitted) (emphasis in original). Whether a defendant is entitled to qualified immunity is a question of law. *Derda v. City of Brighton*, 53 F.3d 1162, 1164 (10th Cir. 1995). Once a defendant claims qualified immunity, the plaintiff bears the "heavy two-part burden" of demonstrating that: (1) the defendant's alleged actions violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established at the time of the alleged violation. *Trigalet v. Young*, 54 F.3d 645, 647 (10th Cir. 1995) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534 [10th Cir. 1995]).

In determining whether qualified immunity shields Sheriff Braudis and Deputy Geister from liability, this court is obligated to consider whether there has been a constitutional violation *before* determining whether the law was clearly established at the time of the alleged violation. *McCook v. Spring Sch. Dist.*, 44 F. App'x 896, 902 (10th Cir. 2002) (citing *Saucier*, 533 U.S. at 201). The goal in first answering the constitutional question is to ensure that the law of qualified immunity does not stymie the development of constitutional law. *See id.* Accordingly, I now turn to the question of whether Plaintiff's allegations regarding her forcible injection of antipsychotics are sufficient to support a Section 1983 Fourth and/or Fourteenth Amendment claim.

### *(1)    Involuntary Sedation Principles Under the Fourteenth Amendment*

I review the law related to involuntary sedation of detainees under the Fourteenth Amendment here, because it provides a useful framework for considering the personal participation question discussed in detail below.  It is well-established that "the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," thus, triggering the protections of the Due Process Clause.  *Washington v. Harper*, 494 U.S. 210, 229 (1990).  In *Harper*, the Supreme Court found that "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness."  *Riggins v. Nevada*, 504 U.S. 127, 135 (1992) (citing *Harper*, 494 U.S. at 229).  In *Riggins*, the Court found that "[t]he Fourteenth Amendment affords at least as much protection to persons the State detains for trial."  *Id.*  In reaffirming this precept, the Court found that the injection of antipsychotic drugs compromises a person's liberty in a "particularly severe" way.  *Id.* at 134.  The Court in *Harper* and *Riggins* did not have before it, and did not address, what process might be required before state prison authorities may administer an antipsychotic drug in an emergency circumstance, as opposed to regularly in the course of ongoing, long-term treatment.  *See Harper*, 494 U.S. at 246–47 (Stevens, J. dissenting).  Since the Supreme Court's decision in *Harper*, neither the Supreme Court nor the Tenth Circuit has addressed what due process is required to sedate a detainee in emergency circumstances.

Prior to *Harper*, however, the Tenth Circuit had already addressed this issue to some degree in *Bee v. Greaves*, 744 F.2d 1387 (10th Cir. 1984). In *Bee*, the court explicitly held that "a pretrial detainee retains a liberty interest derived from the Constitution in avoiding unwanted medication with [antipsychotic] drugs." 744 F.2d at 1394. The court based its holding, in part, upon the "undisputed nature of antipsychotic drugs," which "have the capacity to severely and even permanently affect an individual's ability to think and communicate." *Id.* at 1393–94. Nonetheless, the court found that, even absent a hearing, forcing antipsychotic medication upon a pretrial detainee may be appropriate when the State makes a showing that "treatment with [such] medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of [the detainee's] own safety or the safety of others." *Id.* at 1395.

Based on the foregoing authority, Plaintiff clearly retains a protected liberty interest in avoiding unwanted medication. This conclusion does not end the court's inquiry, however. Plaintiff's liberty interest "must be balanced against competing state interests to determine whether it is outweighed by 'the demands of an organized society.'" *Id.* at 1394 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 320 [1982]). The only competing state interest the Tenth Circuit has explicitly recognized that may be sufficient to overcome a pre-trial detainee's liberty interest in avoiding unwanted antipsychotic medication without a hearing is an emergency that threatens the safety and security of jail occupants. *Id.* at 1395–96. The court was careful to note, however, that "[a]bsent an emergency, . . . [it] did not believe forcible medication with antipsychotic drugs is reasonably related to the concededly legitimate goals of jail safety and security." *Id.* at 1395 (internal quotations and citation omitted).

Further, according to the court:

> Determining that an emergency exists sufficient to warrant involuntary medication with this type of drug requires a professional judgment-call that includes a balancing of the jail's concerns for the safety of its occupants against a detainee's interest in freedom from unwanted antipsychotics. Any decision to administer antipsychotic drugs forcibly must be the product of professional judgment by appropriate medical authorities, applying accepted medical standards. It requires an evaluation in each case of all the relevant circumstances, including the nature and gravity of the safety threat, the characteristics of the individual involved, and the likely effects of particular drugs.

*Id.* at 1395–96 (internal citations omitted). In making this evaluation, the decisionmaker should consider the availability of less restrictive alternatives to antipsychotic sedation, "such as segregation or the use of less controversial drugs like tranquilizers or sedatives." *Id.*

### (2) *Personal Participation in a Constitutional Violation*

County Defendants argue that, because Sheriff Braudis and Deputy Geister did not personally participate in the decision to sedate Plaintiff, summary judgment on Plaintiff's Fourth and Fourteenth Amendment claims against them in their individual capacities is warranted. (Defs.' Br. at 9–12.) Plaintiff counters that the evidence supports a finding that Deputy Geister personally participated in Plaintiff's unconstitutional injection by: (1) participating in the decisionmaking process of whether or not to inject Plaintiff; and (2) participating in the actual injection by restraining Plaintiff during the procedure. (*See* Pl.'s Resp. at 26–36.) As an initial matter, I note that it is beyond dispute that "for liability to arise under [Section] 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006); *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (affirming district court's dismissal, in part, where "plaintiff

failed to allege personal participation of the defendants"); *accord Clayton v. Ward*, 232 F. App'x 827, 830 (10th Cir. 2007).

Plaintiff does not specify in what way Sheriff Braudis personally participated in the alleged constitutional violation. Because Plaintiff has literally presented *no* evidence supporting a finding that Sheriff Braudis, who was not present in the jail on the evening in question, personally participated in the decision to inject Plaintiff or in the injection itself, I grant summary judgment in favor of Sheriff Braudis on Plaintiff's Fourth and Fourteenth Amendment claim against him in his individual capacity. (*See* Pl.'s Resp.) Thus, I need not reach the qualified immunity question with respect to Sheriff Braudis. I now address Deputy Geister's personal participation in the alleged constitutional violation.

### (a)    *Personal Participation in the Decision to Sedate Plaintiff*

Plaintiff argues that by lobbying for Plaintiff's sedation and failing to properly assess whether an emergency existed warranting sedation, Deputy Geister personally participated in the decision to sedate her. (Pl.'s Resp. at 26–36.) Additionally, Plaintiff's briefing suggests that Deputy Geister may have lied to the Paramedics about Plaintiff's behavior, thus affecting the ultimate decision of whether or not to sedate Plaintiff. (*See* Pl.'s Resp., RSOF ¶ 28.) I address each of Plaintiff's contentions in turn.

### (i)    *Lobbying for Plaintiff's Sedation*

Deputy Geister openly admitted to lobbying the medics to sedate Plaintiff. (*See* Pl.'s Resp., Ex. 2 at 10 [Geister Dep.].) He also testified to his understanding that he did not have the

"authority" to make a decision about whether to sedate a detainee. (*See id.*, Ex. 2 at 10 [Geister Dep.].) He stated: "[The medical professionals] look at the situation and say, Yes, you're right. This woman needs to be sedated, or this guy needs to be sedated, or this person needs to be sedated. I don't make the call." (*Id.*) Deputy Geister further stated that "[the medical professionals] do what they're going to do regardless of what I say. I can put my input in there, which I do, and [they] take it from there." (*Id.*, Ex. 2 at 11 [Geister Dep.].)

Deputy Geister's view of his lack of authority in deciding whether to sedate a detainee generally and in the case at bar finds ample support in the record before the court. First, it is undisputed that the Pitkin County Jail's policy regarding involuntary sedation of prisoners is to leave the decision of whether to sedate a detainee to medical professionals. (*See* Defs.' Br., SOF ¶ 38; *admitted at* Pl.'s Resp., RSOF ¶ 38.) Second, Deputy Geister testified that he had called emergency medical staff for possible sedation of inmates in the past and the paramedics had refused to sedate based on their medical judgment that sedation was unnecessary. (Pl.'s Resp., Ex. 2 at 12 [Geister Dep.].) He explained, "[I]f [the ER doctor] say[s] no, it doesn't get done. And I don't argue about it. You don't argue — you don't order the ER doctor to do anything." (*Id.*) Third, Paramedic Coniglio makes clear in his testimony that, in the instant case, the medical professionals — and, in fact, Dr. Martinez alone — made the decision to sedate Plaintiff. Paramedic Coniglio testified that he "initiated contact with Dr. Martinez on [his] own based upon [his] observations," and that he "was not asked or instructed by law enforcement personnel to contact Dr. Martinez or to seek Dr. Martinez's permission to sedate [Plaintiff]." (*Id.*, Ex. 7 ¶ 8 [Coniglio Decl.].) He further testified to informing Dr. Martinez, based upon his own

observations, that "[Plaintiff] was resistive to medical evaluation, refused to come to the hospital emergency room for evaluation, was combative, and was hurting herself by violently pounding and throwing herself against the cell door and by violently struggling against the handcuffs and shackles." (*Id.*, Ex. 7 ¶¶ 8–9 [Coniglio Decl.].) Further, Paramedic Coniglio stated that "[a]t no time did [he] suggest to Dr. Martinez that [Plaintiff] be sedated" and that, "[b]ased upon the information [Mr. Coniglio] provided, Dr. Martinez gave [him] a medical order to sedate [Plaintiff] . . . ." (*Id.*, Ex. 7 ¶¶ 9–10 [Coniglio Decl.].) Fourth, it is undisputed that it was Dr. Martinez who authorized the Paramedics to sedate Plaintiff and that the doctor at no time spoke with Deputy Geister. (Defs.' Br., SOF ¶¶ 27, 31; *admitted at* Pl.'s Resp., RSOF ¶¶ 27, 31.) That Deputy Geister *attempted* to convince the Paramedics to sedate Plaintiff shows — at worst — that he *wished* to participate in the decision of whether or not to sedate Plaintiff. It does not show that he *did* actually participate in such decisionmaking. Because Plaintiff has presented no evidence to counter undisputed testimony that medical authorities made the decision to sedate Plaintiff based upon their independent professional judgment, rather than on the deputy's repeated requests for sedation, I find Plaintiff has failed to show that Deputy Geister's lobbying rendered him a personal participant in the decision to sedate Plaintiff.

### (ii)    *Assessment of Emergency*

Not withstanding this finding, Plaintiff also obliquely argues that Deputy Geister *did* participate in the decision to sedate Plaintiff by incorrectly assessing whether an emergency existed warranting involuntary sedation. (Pl.'s Resp. at 26–36.) Specifically, Plaintiff argues that Deputy Geister failed to properly determine whether less restrictive means of restraint were

appropriate.  (*Id.*)  Whether or not this is true, I cannot agree that such actions constitute personal participation in the decision to sedate Plaintiff.

As an initial matter, there is no record evidence that Deputy Geister assessed whether an emergency existed or whether alternative, less-restrictive means of restraint would have been appropriate for Plaintiff.  (*See id.*, Ex. 2 [Geister Dep.].)  Instead, there is only undisputed evidence that Deputy Geister reported to the Paramedics his observations of Plaintiff's behavior and the availability  — or lack thereof — of alternative means of restraint within the jail.  (*See id.*, Ex. 7 ¶ 3 [Coniglio Decl.].)  There is some dispute as to whether Deputy Geister's report to the Paramedics was accurate, which I will address below.

First, however, I find that by relaying to medical authorities accurate information about a detainee's behavior and alternative means of restraint within the jail, a law enforcement official does not, thereby, become a personal participant in the medical decision of whether or not to sedate a detainee.  *Bee* makes clear that whether an emergency exists sufficient to warrant sedation is a "professional judgment-call" to be undertaken by medical professionals rather than by law enforcement officials.  *See* 744 F.2d at 1395–96.  Although an officer may be required to accurately report the behavior of a detainee, as well as whether alternative means of restraint are *available* within the jail, this court finds that it is outside the officer's area of expertise to determine whether or not a detainee's behavior and the availability of alternative means of restraint constitute an "emergency" sufficient to warrant sedation.  Reflected in this conclusion is the court's concern that an alternative holding may cause an officer to hesitate to call medical authorities for possible sedation of a detainee out of fear that the officer may not have

appropriately assessed whether an "emergency" exists or whether less restrictive, alternative means of restraint would be sufficient, and that such hesitation may prove detrimental to the detainee, jail staff, and other inmates. Thus, any failure to properly assess the existence of an emergency and the appropriateness of alternative, less intrusive means of restraint, properly falls on the shoulders of the medical decisionmakers. Accordingly, I find the fact that Deputy Geister relayed information regarding Plaintiff's behavior and alternative means of restraint available within the jail to the Paramedics simply does not establish him as a personal participant in the decision to sedate Plaintiff.

That being said, should a law enforcement officer knowingly make a *false* report to medical authorities regarding detainee's behavior or the availability of alternative means of restraint, and should that report factor into the medical decision of whether or not to sedate, there would be a stronger argument that the officer made statements to insert him or herself into the decisionmaking process, constituting personal participation in that decision. In the case at bar, there can be no dispute that any report by Deputy Geister that the padded room and the restraining chair were occupied on the night in question was, in fact, accurate. (*See* Defs.' Br., SOF ¶ 36; *admitted at* Pl.'s Resp., RSOF ¶ 36 [noting that at the time of Plaintiff's sedation, the jail's restraint chair and isolation cell were already in use by other inmates].) However, there is some dispute as to whether Deputy Geister falsely reported to the Paramedics that Plaintiff had been banging her head against her cell door. (*See* Def.'s Br. ¶ 28; *admitted at* Pl's Resp. ¶ 28 [Deputy Geister testified that he told paramedics that Plaintiff was banging her head]; Pl.'s Resp.,

SAF ¶¶ 6–7; *admitted at* Defs.' Reply, RSAF ¶¶ 6–7 [Plaintiff testified that she used only her hands to bang on her cell door, never her head].)

On a motion for summary judgment, I must resolve all factual disputes in favor of Plaintiff. *Byers*, 150 F.3d at 1274. Presuming Deputy Geister did make such a false report, I find that a reasonable juror could conclude that Deputy Geister's alleged falsehood influenced Dr. Martinez's decision to sedate Plaintiff. Dr. Martinez testified to his knowledge that the Paramedics had been told by law enforcement personnel "that [plaintiff] had been throwing herself against the jail door and striking the door with her head." (Resp. to Med. Def.'s Mot. for Summ. J., Ex. C at 6 [Martinez Dep.] [filed June 14, 2007].) Moreover, Dr. Martinez stated that in deciding to sedate Plaintiff, he relied, in part, on the reports of jail personnel regarding Plaintiff's behavior. (*See* Defs.' Br., Ex. A–5 ¶ 11 [Martinez Interrogatory].) Finally, Dr Martinez made clear that his decision to authorize sedation was based, in large part, on his view that Plaintiff's behavior suggested she was in danger of hurting herself. (Pl.'s Resp., Ex. 7 at 2 [Martinez Dep.].) Making all reasonable inferences in favor of Plaintiff, a report that she was banging her head against her cell door, rather than simply her fists and feet, could have influenced Dr. Martinez's perception that Plaintiff was likely to injure herself and, thus, required involuntary sedation. Accordingly, I find that by pointing to Deputy Geister's alleged misstatements regarding Plaintiff's self-injurious behavior, Plaintiff has demonstrated a genuine issue of material fact as to whether he injected himself as a "participant" in the decision to sedate Plaintiff.

### (b)    *Personal Participation in Injecting Plaintiff*

Alternatively, Plaintiff argues that Deputy Geister personally participated in the alleged constitutional violation by restraining her during the involuntary sedation.  (Pl.'s Resp. at 20–23.) County Defendants urge that Deputy Geister was merely complying with the medics' request and, thus, cannot be said to have "personally participated" in Plaintiff's sedation.  (Defs.' Br. at 9–12.) I disagree.

As an initial matter, it is important to note that Plaintiff does not allege that Deputy Geister used more force than necessary to restrain her during the injection.[2]  (*See* Pl.'s Resp. at 20–23.)  Second, to this court, it is a matter of common sense that Deputy Geister participated in sedating Plaintiff when he physically restrained her during the injection.  To find otherwise strains credulity.  That Deputy Geister was complying with a medical request goes more to the question of whether the law was clearly established that compliance with the medical request would result in a violation of Plaintiff's constitutional rights, rather than to the more straightforward question of whether, by holding Plaintiff down during the injection, Deputy Geister personally participated in Plaintiff's injection.

Given my findings that a genuine issue of material fact exists as to whether Deputy Geister did, in fact, participate in the decision to sedate Plaintiff, as well as my finding that Deputy Geister personally participated in Plaintiff's sedation by restraining her during the injection, I must next

---

[2]To be clear, Plaintiff does claim that "the restraint and injection which [Deputy Geister] facilitated were unreasonable seizures constituting excessive force," but Plaintiff does not allege that Deputy Geister used more force than necessary to restrain Plaintiff in order to permit the Paramedics to inject her without injuring her.  (*See* Pl.'s Resp. at 36.)

determine: (1) whether Deputy Geister's actions violated Plaintiff's Fourth and/or Fourteenth Amendment rights; and, if so, (2) whether those rights were clearly established at the time of the alleged violation. *Trigalet*, 54 F.3d at 647.

### (3)    *Fourteenth Amendment Violation*

I have already found in a separate order that, based on the information before Dr. Martinez at the time, he made a proper professional judgment-call that an emergency existed warranting involuntary sedation of Plaintiff. (*See* Order and Memorandum of Decision [filed Feb. 29, 2008] [hereinafter "Order"].) Thus, I found his decision to sedate Plaintiff could not have violated her constitutional rights under the Fourth or Fourteenth Amendments. (*Id.*) In light of the disputed issue of fact as to whether Deputy Geister falsely reported that Plaintiff was banging her head, however, my holding regarding Dr. Martinez does not completely resolve the question of whether Deputy Geister participated in a constitutional violation. Because I am required to read the facts in the light most favorable to Plaintiff, I must pay credence to the possibility that, had Dr. Martinez not received a report that Plaintiff was banging her head, he may *not* have concluded that she was such a danger to herself as to warrant forcible sedation.[3] Absent a finding that Plaintiff was a danger to herself or others, Defendants have identified no other medical emergency that may have warranted sedation. Thus, reading the facts in the light most favorable to Plaintiff, I find a reasonable juror could conclude that Deputy Geister's alleged

---

[3]This court's review of the record shows that Dr. Martinez has offered no testimony on this point. (*See* Pl.'s Resp., Ex. 6 [Martinez Dep.]; Defs.' Br., Ex. A–5 [Martinez Interrogatory].)

misrepresentations to the Paramedics could have led to an incorrect medical judgment that Plaintiff was a danger to herself and, in turn, an unconstitutional decision to involuntarily sedate Plaintiff with antipsychotics. Accordingly, I deny summary judgment on Plaintiff's Fourteenth Amendment claim against Deputy Geister in his individual capacity.

### (4) Fourth Amendment Violation

Although Deputy Geister argues that forcible sedation is not cognizable as a "seizure" under the Fourteenth Amendment, he has pointed to no cases so holding. (*See* Defs.' Br. at 15–16.) The Supreme Court has clearly stated that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Here, Plaintiff was physically restrained during the injection and subsequently physically incapacitated by the anitpsychotic medication. As discussed above, read in the light most favorable to Plaintiff, a reasonable juror could conclude that that Deputy Geister participated in both forms of restraint. Thus, this court sees no bar to Plaintiff's Fourth Amendment claim against Deputy Geister in the case *sub judice*.

Moreover, read the light most favorable to Plaintiff, Deputy Geister's allegedly false report that Plaintiff had been banging her head could also establish a Fourth Amendment violation. "Pretrial detainees retain some Fourth Amendment rights upon commitment to a corrections facility." *Bell v. Wolfish*, 441 U.S. 520, 558 (1979). To determine the constitutionality of a seizure, a court "balance[s] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner*, 471 U.S. at 8. In the instant case, the governmental

interest allegedly at stake was preventing Plaintiff from injuring herself. As discussed above, if Dr. Martinez's conclusion that Plaintiff was likely to injure herself may have been different had he not heard reports that Plaintiff was banging her head, the governmental interest at stake would fall away. Thus, reading the facts in the light most favorable to Plaintiff, she has established a genuine issue of material fact as to whether Deputy Geister's allegedly false report led to an unreasonable seizure of her person by forcible injection of an antipsychotic. Accordingly, I deny summary judgment on Plaintiff's Fourth Amendment claim against Deputy Geister in his individual capacity.

### (5)     *Clearly Established Law*

Having found two possible constitutional violations under the summary judgment standard, I must next determine whether the law was clearly established at the time Deputy Geister acted. *See Trigalet*, 54 F.3d at 647–48. There simply can be no doubt that any reasonable officer would know that lying to medical authorities regarding a detainee's behavior in order to encourage forcible sedation was an apparent violation of pre-existing law. *See id.* (noting that qualified immunity should not be granting when unlawfulness of action was apparent "in light of preexisting law"). Qualified immunity jurisprudence establishes that although, "[t]he contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right[, t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ." *Id.* In the instant case, it was clearly established at the time of the alleged incident that detainees have a protected liberty interest in avoiding unwanted administration of antipsychotic drugs. *See Riggins*, 504 U.S. at 1235. Moreover, it was clearly established that unwanted sedation, without

a hearing, *may* be appropriate in an emergency situation in which the safety and security of jail occupants are threatened. *See Bee*, 744 F.2d at 1395–96. Further, it was clearly established that, absent such an emergency, forcible sedation could not be "reasonably related to the concededly legitimate goals of jail safety and security." *Id.* Reading the facts in the light most favorable to Plaintiff, I find a reasonable juror could conclude that Deputy Geister lied to the Paramedics in order to convince them that a medical emergency existed warranting sedation, knowing that absent such an emergency the sedation would be unconstitutional. Thus, I hold that Deputy Geister is not entitled to qualified immunity on the Fourteenth Amendment claim against him.

Regarding the Fourth Amendment claim, Plaintiff has failed to point to a single case in which forcible sedation was considered under the Fourth Amendment and this court's research has failed to reveal any such case. (*See* Pl.'s Resp. at 36–37.) Therefore, it cannot be said that it was clearly established in 2004 that participation in forcible sedation could result in the violation of a detainee's Fourth Amendment rights. Accordingly, Deputy Geister is entitled to qualified immunity for Plaintiff's Fourth Amendment claim against him.

Additionally, this court is inclined to note that if Deputy Geister did not, in fact, lie to the Paramedics regarding Plaintiff banging her head, I would find no Fourteenth or Fourth Amendment violation here. According to the facts and law I have laid out above, determining whether or not Deputy Geister engaged in a constitutional violation by restraining Plaintiff with no more force than necessary to allow safe injection of the antipsychotic requires determining whether the medical decision to inject Plaintiff complied with the law. In my earlier Order, I decided that Dr. Martinez's medical judgment did comply with the law. (*See* Order.) Thus,

absent a finding that Deputy Geister made some false report that affected the decision to sedate Plaintiff, his assistance in restraining Plaintiff at the request of medical professionals and with no more force than necessary, could not have violated clearly established federal law.[4]

### c.    Fourth and Fourteenth Amendment Official Capacity Claims

Plaintiff assert several claims against Pitkin County Commissioners, as well as Sheriff Braudis and Deputy Geister in their official capacities. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" — in this case Pitkin County. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *accord Monell*, 436 U.S. at 691 (noting "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"). As noted above, municipal entities can be sued for deprivations of constitutional or civil rights under Section 1983. *Monell*, 436 U.S. at 690. "To establish municipal liability, Plaintiff must show: (1) the existence of a municipal custom or policy and (2) a

---

[4]Even if I had found Dr. Martinez's decision to inject Plaintiff unconstitutional, considering that the law requires medical professionals, not jail staff, to independently determine, based on their professional judgment, whether or not to sedate a detainee, this court cannot justifying placing "law enforcement officers in the impossible position of having to second-guess the medical judgments" of medical professionals. *Sullivan v. Bornemann*, 384 F.3d 372, 377 (7th Cir. 2004) (finding "[t]here is no rule to the effect that law enforcement officials are constitutionally prohibited from briefly restraining a detainee at the direction of qualified medical personnel, with the purpose of minimizing injury to the detainee"); *see also Bee*, 744 F.2d at 1395–96. As a non-medical professional, a reasonable law enforcement officer cannot be expected to question the judgment of qualified medical professional absent some extraordinary circumstances, the nature of which the court cannot even conjecture at this point. Thus, in this court's view, absent extraordinary circumstances, liability for the medical decision to sedate detainees and order restraint during sedation does not lie with the law enforcement officials who contact medical professionals or who assist in the restraint at the request of those medical professionals.

direct causal link between the custom or policy and the violation alleged." *Jenkins v. Wood*, 81 F.3d 988, 993–94 (10th Cir. 1996) (citation omitted). "The official policy must be the moving force for the constitutional violation in order to establish [municipal liability]." *Haines v. Fisher*, 82 F.3d 1503 (10th Cir. 1996). Thus, if a final policymaker's decision results in a constitutional violation, the municipality will be liable for the violation. *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1319 (10th Cir. 1998).

Here, assuming that Plaintiff's forcible injection was unconstitutional, there is no evidence that a policy of Pitkin County had a "direct causal link" to "the violation alleged." *Jenkins*, 81 F.3d at 993–94. Instead, as discussed above, it is undisputed that the policy of Pitkin County Sheriff's Department regarding involuntary sedation of individuals in custody is to leave the decision of whether to sedate to paramedics guided by a physician-advisor. (Defs.' Br., SOF ¶ 38; *admitted at* Pl.'s Resp., RSOF ¶ 38.) Plaintiff has presented no evidence that Deputy Geister failed to follow this policy in any way. (*See* Pl.'s Resp.) In the case *sub judice*, I find any connection between the policy of leaving the decision of whether to sedate a detainee to medical professionals and those professionals' ultimate decision to sedate the detainee far too attenuated to constitute a direct causal link.[5] In fact, the whole point and obvious import of a policy which places the decision of whether to sedate a detainee into the hands of medical professionals is to

---

[5]The court notes that "'[i]n some sense, of course, almost any injury inflicted by a municipal agent or employee ultimately can be traced to a municipal policy.'" *D.T. v. Indep. Sch. Dist.*, 894 F.2d 1176, 1188 (10th Cir. 1990) (quoting *Springfield v. Kibbe*, 480 U.S. 257, 267 [1987] [O'Connor, J., dissenting]).

break any causal chain between law enforcement personnel's actions and any sedation that may occur.

Additionally, I note that Pitkin County's policy comports with Tenth Circuit precedent mandating that the decision to sedate be left to medical professionals. *See Bee*, 744 F.2d at 1395–96. Further, Plaintiff has presented no evidence that the policy itself — rather than its implementation in her case — was unconstitutional. (*See* Pl.'s Resp.) "[W]here the policy relied upon is not itself unconstitutional, considerably more proof than a single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985). Here, Plaintiff has only pointed to a single incident of alleged constitutional deprivation. Based on the foregoing, I find Plaintiff has failed to set forth sufficient facts to establish a direct causal connection between the municipal policy and the alleged constitutional violation at issue. Thus, I grant summary judgment on Plaintiff's Fourth and Fourteenth Amendment claims against Pitkin County Commissioners, as well as Deputy Geister and Sheriff Braudis in their official capacities.

### d.     Failure to Train

Plaintiff also alleges constitutional failure to train against Sheriff Braudis in his official capacity. (Compl. ¶ 57–68.) County Defendants argue that the training provided by Sheriff Braudis — that the decision of whether to sedate is to be left to medical professionals — comports with constitutional requirements. (*See* Defs.' Br. at 17–18; Defs.' Reply at 20.) The Supreme Court has established that "the inadequacy of police training may serve as a basis for

[Section] 1983 liability only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). Here, it is undisputed that Sheriff Braudis trained his staff that when they believed an individual needed forcible medication, they were to call the Paramedics, and then it became a medical decision as to whether or not to sedate. (Pl.'s Resp., Ex. 12 at 4 [Braudis Dep.]; *see id.* at 38–41.) As I have already discussed in detail above, it is the medical authorities who must determine whether sedation is appropriate, considering all relevant factors, including whether an emergency exists such that the safety of the detainee or others in the jail are at risk and whether alternative, less restrictive means of restraining the detainee are available. Leaving this decision in the hands of medical professionals by no means constitutes "deliberate indifference" to the rights of detainees. *See Harris*, 489 U.S. at 389. Instead, as discussed above, it reflects the sound conclusion of the Supreme Court and the Tenth Circuit that medical professionals, rather than law enforcement personnel, are the individuals most qualified to balance these competing interests. *See Riggins*, 504 U.S. at 135; *Bee*, 744 F.2d at 1395–96. Thus, I hold that employee training by Pitkin County Jail with respect to sedation of detainees was not in violation of Section 1983. Taken together, my findings throughout this order stand for the proposition that, even if Plaintiff's sedation was in violation of the constitution, Plaintiff must look to those who made the decision to sedate her for redress, rather than to law enforcement personnel who — following the Pitkin County policy and Tenth Circuit law — opened their doors to those decisionmakers.

### e. First Amendment

Plaintiff's only remaining claim with respect to County Defendants is her allegation that Deputy Geister retaliated against her for exercising her First Amendment right to free speech by pounding on the jail cell door and calling for assistance in order to ensure the safety of her child. (Compl. ¶¶ 96–77.)  County Defendants argue summary judgment is warranted on this claim because: (1) Plaintiff has admitted that no staff member retaliated against her; and (2) Plaintiff's screaming and pounding on the door of her jail cell was not protected speech.  (Defs.' Br. at 21–22; Defs.' Reply at 16–18.)  I need only address County Defendants' second argument.

First Amendment retaliation claims are most often brought in the public employment context.  *McCook v. Spring Sch. Dist.*, 44 F. App'x 896, 903 (10th Cir. 2002).  However, when a plaintiff is not an employee of and has no contractual relationship with the defendant, caselaw from this circuit suggests applying the substantive standard announced in *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000); *see McCook*, 44 F. App'x at 902 (applying *Worrell* standard outside the public employment context); *McCormick v. City of Lawrence*, 253 F. Supp. 2d 1156, 1168 (D. Kan. 2003) (same).  The *Worrell* standard requires proof of the following elements to support a First Amendment retaliation claim:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

219 F.3d at 1212 (internal quotations omitted).

In the case at bar, I find Plaintiff fails at the first element. For speech to be constitutionally protected, it must involve a matter of public concern or an issue of public importance. *McCook*, 44 F. App'x at 904 (citing *Connick v. Myers*, 461 U.S. 138 [1983].) "In determining whether speech pertains to a matter of public concern, the court may consider 'the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest.'" *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1224 [10th Cir. 2000]). "[T]he relevant inquiry is not whether the public would be interested in the topic of the speech at issue but rather is whether the purpose of [the plaintiff's] speech was to raise issues of public concern." *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000) (internal quotation marks omitted).

Plaintiff has failed to cite a single case supporting her proposition that pounding on her cell door and screaming that she wanted to call her daughter constitutes a matter of public concern. (*See* Pl.'s Resp. at 41–44.) Reading the facts in the light most favorable to Plaintiff, the record supports the finding that Plaintiff's intention in pounding on her cell door was exclusively to air her personal grievance regarding the jail's failure to allow her to contact her daughter. (*See id.*, SAF ¶ 4; *admitted at* Defs.' Reply, RSAF ¶ 4.) Nowhere does Plaintiff suggest this failure was illegal, only that it caused her great personal distress. (*See id. passim.*) Instead, she testified that "she would have stopped beating on the door and yelling for a call if someone had said they would check on her child's safety." (*Id.*, SAF ¶ 8; *admitted at* Defs.' Reply, RSAF ¶ 8.) Plaintiff's testimony supports a finding that her goals were patently personal in nature.

Moreover, this court's independent research has revealed no cases suggesting that Plaintiff's understandable concerns regarding the well-being of her own daughter who was *not* in the custody of the state was a matter that was in and of itself of interest to the public at large. *Cf. Crain v. Bd. of Police Comm'rs*, 920 F.2d 1042, 1411 (8th Cir. 1990) (finding that police officer's grievance regarding the police department's sick leave policy was not a matter of public concern, even though it was a matter of significance to the police officer's own family and all relatives of city police officers); *Boyce v. Andrews*, 510 F.3d 1333, at *27 (11th Cir. 2007) (noting an individual "may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run") (quotation marks omitted). Based on the foregoing, I find summary judgment against Plaintiff on her First Amendment claim against Deputy Geister is warranted.

### 3.    *Conclusion*

Based on the foregoing it is therefore ORDERED as follows:

1.    County Defendants' Motion for Summary Judgment (# 47) is GRANTED IN PART.

      A.    All of Plaintiff's Claims against Defendants Pitkin County Commissioners are DISMISSED.

      B.    All of Plaintiff's Claims against Sheriff Braudis in his official and individual capacities are DISMISSED.

      C.    All of Plaintiff's Claims against Deputy Geister in his official capacity are DISMISSED.

D.      Plaintiff's First and Fourth Amendment claims against Deputy Geister is

DISMISSED.

E.      Plaintiff's Fourteenth Amendment Claims against Deputy Geister in his

individual capacity remain PENDING.

2.      The clerk shall forthwith enter judgment in favor of Defendants Pitkin County

Commissioners and Sheriff Braudis, dismissing all claims with prejudice.  These

Defendants may have their costs by filing a bill of costs within eleven days of the

date of this order.

Dated this 29th day of February, 2008.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge