IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–01592–EWN–KLM


BRONWYN ANGLIN,

     Plaintiff,

v.

CITY OF ASPEN, COLORADO, a municipality,
LOREN RYERSON, CHIEF OF POLICE, in his official and individual capacity,
ASPEN POLICE OFFICER MELINDA CALVANO, in her official and individual capacity,
ASPEN POLICE OFFICER DAN DAVIS, in his official and individual capacity,
PITKIN COUNTY COMMISSIONERS, in their official and individual capacities,
PITKIN COUNTY SHERIFF ROBERT BRAUDIS, in his official and individual capacity,
PITKIN COUNTY DEPUTY SHERIFF WALT GEISTER, in his official and individual capacity,
DOCTOR CHRIS MARTINEZ,

     Defendants.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

     This is a civil rights case in which Plaintiff Brownyn Anglin alleges Defendants, Aspen

Police Department Officer Dan Davis, Aspen Police Chief Loren Ryerson and the City of Aspen

(hereinafter collectively "Aspen Defendants") and a former Aspen Police Department officer,

Officer Melinda Calvano (hereinafter "Officer Calvano"), violated her rights to due process and

free speech, as well as her right to be free from unreasonable seizure, by forcibly injecting her

with antipsychotic medication while she was in custody at the Pitkin County Jail.  This matter is

before the court on "Defendants, City of Aspen, Police Chief Loren Ryerson and Officer Dan

Davis's Motion for Summary Judgment," filed on April 11, 2007 and Officer Calvano's "Motion for Summary Judgment," filed on April 11, 2007. Jurisdiction is premised upon the existence of a federal question pursuant to 28 U.S.C. §§ 1331 and 1343.

## FACTS

### 1.     Factual Background

#### a.     Facts Regarding the Events in the Jail

On the evening of December 11, 2004, Plaintiff, her boyfriend, Byron Hawkins, and her four-year-old daughter attended a dinner party at the apartment of her friend, Amber Nespeca. (Defs. City of Aspen, Police Chief Loren Ryerson and Officer Dan Davis's Br. in Supp. of Mot. for Summ. J. [hereinafter "Aspen Defs.' Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 1 [filed Apr. 11, 2007]; *admitted at* Resp. to Aspen Defs.' Mot. for Summ. J. [hereinafter "Pl.'s Resp."], Resp. to Statement of Undisputed Material Facts [hereinafter "RSOF"] ¶ 1 [filed June 14, 2007].) Kevin Dunkleburg, Ms. Nespeca's boyfriend, also attended the party. (*Id.*) Over the course of the evening, Plaintiff consumed four to five glasses of wine. (*Id.*, SOF ¶ 2; *admitted at* Pl.'s Resp., RSOF ¶ 2.) During the party, Ms. Nespeca and Mr. Dunkleburg became embroiled in an argument, and Plaintiff witnessed Mr. Dunkleburg hitting Ms. Nespeca. (*Id.*, SOF ¶ 3; *admitted at* Pl.'s Resp., RSOF ¶ 3.) Out of concern for Ms. Nespeca, Plaintiff called 9-1-1, and Aspen Valley Police Officers Calvano and Ron Fabrocini, as well as Officer Dan Davis (hereinafter "Officer Davis"), were dispatched to the scene. (*Id*, SOF ¶¶ 3–4; *admitted at* Pl.'s Resp., RSOF ¶¶ 3–4; Def. Officer Calvano's Br. in Supp. of Mot. for Summ. J. [hereinafter "Calvano's Br."], Statement of Undisputed Material

Facts [hereinafter "SOF"] ¶ 1 [filed Apr. 11, 2007], *admitted at* Resp. to Calvano's Mot. for

Summ. J. [hereinafter "Pl.'s Resp. to Calvano"], Resp. to Statement of Undisputed Material

Facts [hereinafter "RSOF"] ¶ 1 [filed June 14, 2007].)  Upon arrival, the police arrested Ms.

Nespeca.  (Aspen Defs.' Br., SOF ¶ 4; *admitted at* Pl.'s Resp., RSOF ¶ 4.)  Plaintiff testified that

she tried to get up from the couch but was shoved back down by Officer Davis and told that if

she got up again she would be arrested.  (*Id.*, SOF ¶ 5; *admitted at* Pl.'s Resp., RSOF ¶ 5.)

Plaintiff later went outside and approached the police vehicle.  (*Id.*)  Plaintiff testified

that she did not remember opening the police car door, but thought it was possible she might

have, since she was trying to ask Officer Davis a question, and had knocked on his window.

(*Id.*)  Plaintiff testified that Officer Davis told her that if she wanted to talk to Ms. Nespeca she

could do so at the jail.  (*Id.*)  Feeling that Ms. Nespeca's arrest was her fault, Plaintiff left her

daughter with Mr. Hawkins to go to the jail to help her friend.  (*Id.*, SOF ¶ 7; *admitted at* Pl.'s

Resp., RSOF ¶ 7.)

Plaintiff went to the jail lobby to obtain Ms. Nespeca's ATM card and PIN number so

that Plaintiff could obtain sufficient funds to bond her out of jail.  (*Id.*, SOF ¶ 8–9; *admitted at*

Pl.'s Resp., RSOF ¶ 8–9.)  Plaintiff left the jail and returned a short time later with the funds, at

the same time that Office Davis was entering the jail.  (*Id.*, SOF ¶ 9; *admitted at* Pl.'s Resp.,

RSOF ¶ 9.)  Officer Davis told Plaintiff that Ms. Nespeca would not be released that night.  (*Id.*)

Deputy Walt Geister (hereinafter "Deputy Geister") was the sole Pitkin County Sheriff's Deputy

present and the person charged with running the jail that evening.  (*Id.*, SOF ¶ 10; *admitted at*

Pl.'s Resp., RSOF ¶ 10.)  Deputy Geister made the decision that Ms. Nespeca would not be

released based on his understanding that both Ms. Nespeca and Plaintiff were intoxicated. (*Id.*; Calvano's Br., SOF ¶ 2; *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 2.)

Ms. Nespeca, realizing that she would not be released, asked Plaintiff to leave the jail. (Aspen Defs.' Br., SOF ¶ 11; *admitted at* Pl.'s Resp., RSOF ¶ 11.) Plaintiff did not leave and instead called 9-1-1 to locate a sheriff because she did not know how else to reach one. (*Id.*) The operator placed Plaintiff on hold. (*Id.*, SOF ¶ 12; *admitted at* Pl.'s Resp., RSOF ¶ 12.) Plaintiff thought she had been disconnected and called 9-1-1 again. (*Id.*) The operator, who sounded busy and under stress, put Plaintiff on hold again. (*Id.*) Plaintiff then hung up and phoned 9-1-1 for the third time, which made the operator angry. (*Id.*) Plaintiff admits that in retrospect she realized she did not have a true emergency. (*Id.*, SOF ¶ 11; *admitted at* Pl.'s Resp., RSOF ¶ 11; Calvano's Br., SOF ¶ 4; *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 4.) The operator contacted Officer Calvano and complained that she was being harassed and that Plaintiff's calls were interfering with her ability to respond to other calls. (Calvano's Br., SOF ¶ 5; *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 5; Aspen Defs.' Br., SOF ¶ 13; *admitted at* Pl.'s Resp., RSOF ¶ 13.)

In response, Officer Calvano approached Plaintiff in the lobby and told her she was arresting her. (Aspen Defs.' Br., SOF ¶ 13; *admitted at* Pl.'s Resp., RSOF ¶ 13.) Officers Calvano and Davis then restrained Plaintiff. (*Id.*; Calvano's Br., SOF ¶ 7; *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 7.) Deputy Geister testified that members of the Aspen Police Department sometimes function as auxiliary deputy sheriffs, as they did the night in question. (Pl.'s Resp. to Calvano, Statement of Additional Disputed or Undisputed Facts [hereinafter "SAF"] ¶ 38;

*admitted in relevant part at* Calvano's Reply in Supp. of Mot. for Summ. J. [hereinafter

"Calvano's Reply"], Resp. Concerning Disputed Facts [hereinafter "RSAF"] ¶ 38 [filed July 7,

2007].)

Deputy Geister, who was in charge, decided to put Plaintiff in the jail's maximum

security cell. (Aspen Defs.' Br., SOF ¶ 14; *admitted at* Pl.'s Resp., RSOF ¶ 14.) Plaintiff

struggled and had to be dragged to her cell, because she was terrified by the thought of being

placed in maximum security. (*Id.*) Plaintiff asked several times to make a phone call to ensure

that her daughter was safe. (Aspen Defs.' Br., SOF ¶ 15; *admitted at* Pl.'s Resp., RSOF ¶ 15.)

Plaintiff testified that Officer Davis responded by stating he could not allow her to do so

"because of the Patriot Act". (*Id.*) After Plaintiff was placed in a cell, her handcuffs and

shackles were removed. (*Id.*)

Once in the cell, Plaintiff began yelling out her request for a phone call to her daughter.

(Pl.'s Resp., Statement of Additional Disputed or Undisputed Facts [hereinafter "SAF"] ¶ 4;

*admitted at* Aspen Defs.' Reply in Supp. of Mot. for Summ. J. [hereinafter "Aspen Defs.'

Reply"], Resp. Concerning Disputed Facts [hereinafter "RSAF"] ¶ 4 [filed July 2, 2007]; Pl.'s

Resp. to Calvano, SAF ¶ 4; *admitted at* Calvano's Reply, RSAF ¶ 4.) According to Plaintiff,

after about ten minutes, Officer Davis came into her cell and told her to shut up or he would have

her sedated. (Aspen Defs.' Br., SOF ¶ 15; *admitted at* Pl.'s Resp., RSOF ¶ 15.) Plaintiff

specifically testified that she pounded on the door as hard as she could. (Pl's Resp., SAF ¶ 7;

*admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶ 7; Pl.'s Resp. to Calvano, SAF ¶ 7;

*admitted in relevant part at* Calvano's Reply, RSAF ¶ 7.)

Deputy Geister testified that he usually allowed detainees to make a phone call. (Pl.'s Resp.,SAF ¶ 9; *admitted at* Aspen Defs.' Reply, RSAF ¶ 9; Pl.'s Resp. to Calvano, SAF ¶ 9; *admitted at* Calvano's Reply, RSAF ¶ 9.) He also stated that he was not aware Plaintiff wished to call her child until he entered her cell with the Paramedics around 4:00 A.M. (Pl.'s Br., Ex. 2 at 8 [Geister Dep.].) By that point, according to Deputy Geister, Plaintiff "had lost all credibility" with him. (*Id.*) He testified that did he not allow her to make a phone call because doing so would only wake up her young daughter. (*Id.*)

Officer Calvano testified that she did not know what Plaintiff was yelling, but called it intrusive to the inmates and obstructive to jail staff. (Pl.'s Resp., SAF ¶ 5; *admitted at* Aspen Defs.' Reply, RSAF ¶ 5; Pl.'s Resp. to Calvano, SAF ¶ 5; *admitted at* Calvano's Reply, RSAF ¶ 5.) Officer Calvano testified, though, that Plaintiff did not stop her from doing her job at the jail that night; her yelling was "just something I had to listen to." (*Id.*)

Plaintiff testified that she used her hands and may have kicked the door, but never used her head, arms or torso in pounding on the door. (Pl.'s Resp., SAF ¶ 6; *admitted at* Aspen Defs.' Reply, RSAF ¶ 6; Pl.'s Resp. to Calvano, SAF ¶ 6; *admitted at* Calvano's Reply, RSAF ¶ 6.) Deputy Geister testified that he attempted to call the emergency room doctor because he was concerned that Plaintiff would injure herself. (Aspen Defs.' Br., SOF ¶ 17; *admitted at* Pl.'s Resp., RSOF ¶ 17; Calvano's Br., SOF ¶¶ 9–10; *admitted at* Pl.'s Resp. to Calvano, RSOF ¶¶ 9–10.) He could not reach the emergency room doctor so he had the 9-1-1 operator page paramedics. (*Id.*) Deputy Geister testified that he thought Plaintiff needed to be given a shot of a sedative. (Aspen Defs.' Br., SOF ¶ 17; *admitted at* Pl.'s Resp., RSOF ¶ 17) However, he

understood it to be a medical decision that the paramedics ultimately would have to make.  (*Id.*; Calvano's Br., SOF ¶ 11; *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 11.)

Paramedics Damien Coniglio and Mark Hutchinson (hereinafter the "Paramedics") were dispatched to the jail.  (Aspen Defs.' Br., SOF ¶ 19; *admitted at* Pl.'s Resp., RSOF ¶ 19.) According to Officer Davis, he did not have any discussions with the Paramedics and made no requests of or suggestions to them about how they should deal with Plaintiff.  (*Id.*)  Paramedic Hutchinson testified that the officers did not make any requests to administer any type of medication and that paramedics "do not take requests from police officers regarding medical care."  (*Id.*)

The Paramedics entered Plaintiff's cell with Officers Davis and Calvano to evaluate Plaintiff.  (*Id.*, SOF ¶¶ 19–20; *admitted at* Pl.'s Resp., RSOF ¶¶ 19–20.)  Plaintiff was sitting on her bed.  (*See* Pl.'s Resp., SAF ¶ 32; *admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶ 32.)  Plaintiff pleaded not to be injected and asked Deputy Geister for his name, stating that she intended to sue him.  (*Id.*, SAF ¶¶ 14, 17; *admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶¶ 14, 17.)  The Paramedics requested the Officers to restrain Plaintiff so that they could assess her vital signs.  (Calvano's Br., SOF ¶ 12, *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 12.)  With the aid of Officer Calvano and an unidentified officer, by using force and by placing Plaintiff in shackles and handcuffs, the Paramedics took Plaintiff's vital signs, which were normal.  (*Id.*, SOF ¶ 14, *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 14; Aspen Defs.' Br., SOF ¶ 20; *admitted at* Pl.'s Resp., RSOF ¶ 20.)  Plaintiff does not contend that Officer Davis had any physical contact with her, but testified that he stood in the doorway of the cell throughout the time the

Paramedics were there, periodically laughing.  (Aspen Defs.' Br., SOF ¶ 20; *admitted at* Pl.'s Resp., RSOF ¶ 20.)  Paramedic Hutchinson assessed Plaintiff as "very upset" and as having slurred speech.  (Pl.'s Resp., SAF ¶ 12; *admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶ 12.)  He also noted that she was "shouting obscenities."  (*Id.*)

According to the Paramedics, Deputy Geister had told them that Plaintiff was banging her head against the cell door.  (Pl.'s Resp., SAF ¶ 12; *admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶ 12.)  Paramedic Coniglio then called Dr. Chris Martinez to discuss the information he had been given about Plaintiff's behavior that night, as well as his own observations, examination and evaluation.  (*Id.*, SOF ¶ 21; *admitted at* Pl.'s Resp., RSOF ¶ 21; Calvano's Br., SOF ¶ 15, *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 15.)  Paramedic Coniglio also held the telephone up so that Dr. Martinez could hear Plaintiff screaming and pounding on the door of her cell.  (Calvano's Br., SOF ¶ 16, *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 16.)

Dr. Martinez authorized the Paramedics to sedate Plaintiff.  (Pl.'s Resp., SAF ¶ 18; *admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶ 18.)  The Paramedics asked the police to assist them with restraining Plaintiff so that they could safely administer the sedative.  (Aspen Defs.' Br., SOF ¶ 23; *admitted at* Pl.'s Resp., RSOF ¶ 23.)  Plaintiff testified that she thought the Paramedics were acting at Officer Davis' direction because the next time she saw him after he threatened to sedate her was when he was entering the cell with the Paramedics.  (*Id.*, SOF ¶ 22; *admitted in relevant part* Pl.'s Resp., RSOF ¶ 22.)  Plaintiff thought the Paramedics looked to Officer Davis as if taking directions.  (*Id.*)

Plaintiff protested and physically resisted.  (*Id.*, SOF ¶ 23; *admitted in relevant part* Pl.'s Resp., RSOF ¶ 23.)  Officer Calvano testified that the prospect of the injection "escalated" the situation and dramatically increased Plaintiff's distress.  (Pl.'s Resp. to Calvano, SAF ¶ 17; *admitted at* Aspen Defs.' Reply, RSAF ¶ 17.)  To assist in injecting Plaintiff, Officer Calvano pushed Plaintiff's face down on the bed.  (*Id.*, SAF ¶ 15; *admitted at* Aspen Defs.' Reply, RSAF ¶ 15.)  Deputy Geister and the Paramedics also used force to restrain Plaintiff for the injection. (*Id.*)  At one point, Plaintiff reached up with her hands and grabbed the hair on the left side of her head in an effort to keep the paramedics from injecting her.  (*Id.*, SAF ¶ 17; *admitted at* Aspen Defs.' Reply, RSAF ¶ 17.)  Plaintiff testified that Officer Calvano and a paramedic pulled her hands down, causing hair to be pulled out and her scalp to bleed.  (*Id.*; Calvano's Br., SOF ¶ 19; *admitted at* Pl.'s Resp. to Calvano, RSOF ¶ 19.)  The handcuffs and shackles were removed after the injection.  (Aspen Defs.' Br., SOF ¶ 23; *admitted in relevant part* Pl.'s Resp., RSOF ¶ 23.) Shortly thereafter, Plaintiff lost consciousness.  (*Id.*)

Plaintiff admits that at some point before she was sedated she was told that an officer was going to go to Mr. Hawkins' residence to inform him that Plaintiff had been arrested and would be spending the night in jail.  (*Id.*, SOF ¶ 18; *admitted in relevant part* Pl.'s Resp., RSOF ¶ 18.) Plaintiff testified that she was not told until the Paramedics were in her cell that an officer would make sure her daughter was alright and that she would have stopped beating on the door and yelling for a call "if someone had said they would check on her child's safety."  (Pl.'s Resp., SAF ¶ 8; *admitted in relevant part at* Defs.' Reply, RSAF ¶ 8; Pl.'s Resp. to Calvano, SAF ¶ 8; *admitted in relevant part at* Calvano's Resp., RSAF ¶ 8.)

The drug used to sedate Plaintiff, Droperdiol, is most similar to the antipsychotic Haldol. (Pl.'s Resp, SAF ¶ 18; *admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶ 18; Pl.'s Resp. to Calvano, SAF ¶ 18; *admitted in relevant part at* Calvano's Reply, RSAF ¶ 18.)  This drug has received a "black box warning," which denotes the Food and Drug Administration's highest level of risk for an available prescription medication.  (Pl.'s Resp, SAF ¶ 18; *admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶ 18; *see also id.*, Ex. 6 at 3 [Martinez Dep.]; Pl.'s Resp. to Calvano, SAF ¶ 18; *admitted in relevant part at* Calvano's Reply, RSAF ¶ 18.)  Alcohol is listed as an agent that interacts with Droperidol, and intoxication and female gender increase the risk for potentially fatal arrhythmia associated with the drug.  (Pl.'s Resp., SAF ¶ 20; *admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶ 20; Pl.'s Resp. to Calvano, SAF ¶ 20; *admitted at* Calvano's Reply, RSAF ¶ 20)  The Paramedics injected Plaintiff with four times the manufacturer's maximum recommended dosage and twice the dosage prescribed in Dr. Martinez's own training protocol.  (Pl.'s Resp., SAF ¶ 22; *admitted in relevant part at* Aspen Defs.' Reply, RSAF ¶ 22; *see also id.*, Ex. 6 at 5 [Martinez Dep.]; Pl.'s Resp. to Calvano, SAF ¶ 22; *admitted at* Calvano's Reply, RSAF ¶ 22.)

### b.    *Facts Regarding the Jail and Police Department Policies*

Pitkin County Sheriff Robert Braudis, who was not at the Pitkin County Jail during the night in question, testified that the policy of the Pitkin County Sheriff's Department is to leave the decision of whether to sedate an inmate involuntarily to paramedics who are guided by a physician-advisor.  (Pl.'s Resp., SAF ¶ 25; *admitted at* Aspen Defs.' Reply, RSAF ¶ 25; Pl.'s Resp. to Calvano, SAF ¶ 25; *admitted at* Calvano's Reply, RSAF ¶ 25.)  He also stated that his

staff was trained that when they believed an individual needed forcible medication, they were to call paramedics, and then it would become a medical decision as to whether or not to sedate. (Pl.'s Resp., Ex. 12 at 4 [Braudis Dep.].)

Deputy Geister testified that when an inmate was "out of control," and the jail had no other means of restraining that individual, he understood that he had a right to page paramedics so that they could determine whether sedation was necessary. (Pl.'s Resp., Ex. 2 at 10–11 [Geister Dep.].) No Pitkin County Jail policies prohibited deputies from encouraging medical personnel to sedate a detainee. (*Id.*, SAF ¶ 31; *admitted at* Aspen Defs.' Reply, RSAF ¶ 31; Pl.'s Resp. to Calvano, SAF ¶ 31; *admitted at* Calvano's Reply, RSAF ¶ 31.)

Officer Calvano testified that she was trained that individuals have a right to refuse medical treatment but was not specifically trained on the circumstances under which forcible injection is permissible. (Pl.'s Resp. to Calvano, Ex. 3 at 2 [Calvano Dep.].) Further, Officer Calvano testified to her understanding that the decision of whether to inject a detainee "gets turned over to the paramedics and the people in the medical profession. It's not my responsibility to let them waive their medical rights or anything, because that's not my capacity of [sic] my job." (*Id.*)

The Aspen Police Department policy manual in use in December 2004 contained a comprehensive use of force policy. (Aspen Defs.' Br., SOF ¶ 28; *admitted at* Pl.'s Resp., RSOF ¶ 28.) It is the Department's practice to train its officers regularly on the use of force. (*Id.*) All Aspen police officers, including Officers Davis and Calvano, received training quarterly on the use of force. (*Id.*) Because its officers normally are not in situations where they are responsible

for administering medication, the Aspen Police Department did not have a written policy on administrating medication to nonconsenting persons. (*Id.*) Aspen officers were trained only to provide first responder first aid and Cardiopulmonary Resuscitation ("CPR"), where appropriate. (*Id.*) According to Chief Ryerson, restraining Plaintiff and otherwise directly aiding paramedics to inject her would not be contrary to their policy. (Pl.'s Resp., SAF ¶ 43; *admitted at* Aspen Defs.' Reply, RSAF ¶ 43.)

### c. Facts related to Plaintiff's First Amendment Claim

Plaintiff testified that on August 17, 2004, Officer Davis and another Aspen Police officer were questioning one of Plaintiff's employees, Johanna Mlinar, in front of Plaintiff's store in Aspen. (Aspen Defs.' Br., SOF ¶ 26; *admitted at* Pl.'s Resp., RSOF ¶ 26.) Plaintiff went out and asked Officer Davis whether Ms. Mlinar was going to be arrested because Plaintiff wanted to make sure she had someone to work in the store the following day. (*Id.*) According to Plaintiff, Officer Davis became irate, shouted at her and threatened to have her arrested. (*Id.*) Plaintiff alleges her speech prompted Officer Davis to retaliate against her subsequently. (*Id.*)

Plaintiff also testified that in the lobby of the jail she said "fuck off" to Officer Calvano and that she believes that this contributed to her subsequent actions towards Plaintiff. (Calvano's Br., Ex. A–5 at 11 [Anglin Dep.]; Ex. A–6 at 5 [Anglin Resp. to Interrogs.].)

## 2. Procedural History

On August 11, 2006, Plaintiff filed a complaint in this court alleging the following constitutional violations stemming from her involuntary sedation: (1) denial of due process by all Defendants in violation of the Fourteenth Amendment; (2) unreasonable seizure by all Defendants

in violation of the Fourth Amendment; (3) constitutional failure to train by Police Chief Ryerson, Sheriff Braudis, the Aspen Valley Hospital, and Dr. Martinez; and (4) retaliation for Plaintiff's exercise of free speech in violation of the First Amendment by Officers Davis and Calvano and Deputy Geister.  (Compl. and Jury Demand [filed Aug. 11, 2006] [hereinafter "Compl."].)  The claims are brought against the individuals both in their individual and official capacities.

On April 11, 2007, Aspen Defendants filed a motion for summary judgment on all counts against them.  (Aspen Defs.' Br.)  On June 14, 2007, Plaintiff responded to that motion.  (Pl.'s Resp.)  On July 2, 2007, Aspen Defendants filed a reply in support of their motion.  (Aspen Defs.' Reply.)  On April 11, 2007, Officer Calvano filed a motion for summary judgment on all counts against her.  (Calvano's Br.)  On June 14, 2007, Plaintiff responded to the motion.  (Pl.'s Resp. to Calvano)  On July 9, 2007, Officer Calvano filed a reply in support of her motion.  (Calvano's Reply.)  These matters are fully briefed and ripe for review.

Regarding the other defendants in this case, on June 22, 2007, the court granted Plaintiff's unopposed motions to dismiss Defendants Aspen Valley Hospital, Coniglio and Hutchinson. (*See* Order Dismissing Def. Aspen Valley Hospital [filed June 22, 2007]; Order Dismissing Defs. Coniglio and Hutchinson [filed June 22, 2007].)

On February 29, 2008, the court found in a separate order that Dr. Martinez, based on the information before him at the time, made a proper professional judgment that an emergency existed warranting involuntary sedation of Plaintiff.  (*See* Order and Mem. of Decision [filed Feb. 29, 2008] [hereinafter "Martinez Order"].)  Thus, the court found his decision to sedate Plaintiff

could not have violated her constitutional rights under the Fourth or Fourteenth Amendments. (*Id.*)

On the same day, the court also dismissed: (1) all of Plaintiff's claims against Pitkin County Commissioners and Sheriff Braudis in his official and individual capacities; (2) all of Plaintiff's claims against Deputy Geister in his official capacity; and (3) Plaintiff's First and Fourth Amendment claims against Deputy Geister in his individual capacity. (*See* Order and Memorandum of Decision [filed Feb. 29, 2008] [hereinafter "County Defendants Order"].) Plaintiff's Fourteenth Amendment claims against Deputy Geister in his individual capacity remains pending. (*See id.*)

## ANALYSIS

### 1.     *Legal Standard for Motion for Summary Judgment*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the

allegations in the pleadings but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2.    *Evaluation of Claims*

Plaintiff asserts that Aspen Defendants and Officer Calvano's (hereinafter "Police Defendants") acts in restraining and involuntarily sedating her: (1) constituted unlawful seizure, in violation of the Fourth Amendment; (2) denied Plaintiff her right to due process of law, in violation of the Fourteenth Amendment; (3) are a result of Chief Ryerson's failure to train and supervise Officers Davis and Calvano, in violation of the Fourth and Fourteenth Amendments; and (4) involved Officers Davis and Calvano's retaliation against Plaintiff for exercise of free speech rights, in violation of the First Amendment. (*See* Compl.) Plaintiff also claims that as a result of the above violations of the Fourth and Fourteenth Amendments, the City of Aspen is subject to municipal liability for the decisions of its policymakers, since such acts are deemed to be its "policy." (*See* Compl.; Pl.'s Resp. at 20.)

### a.    *Preliminary Note*

Plaintiff argues that material issues of fact are contested in this case, "including, centrally, whether a genuine emergency existed sufficient to override Ms. Anglin's fundamental liberty and privacy interests" and whether Deputy Geister's testimony that Plaintiff was banging her head or body against the cell door was accurate.  (Pl.'s Resp. at 28, 42.)

The court agrees with Plaintiff that resolution of this case against the Aspen Defendants and Officer Calvano primarily depends on whether these Defendants were involved in determining whether an emergency existed that would warrant sedating Plaintiff.  However, the court has already addressed this issue in a separate order and concluded that this decision belonged to Dr. Martinez and that, based on the information before him at the time, he made a proper professional judgment that an emergency existed warranting involuntary sedation of Plaintiff.  (*See* Martinez Order.)  Therefore, the issues whether an emergency existed and who was authorized to make that determination have already been resolved.  Thus, the remaining question now before the court is whether Defendants' acts in restraining Plaintiff to help the paramedics sedate her was justified as a matter of law.

As to Deputy Geister's testimony, however, Plaintiff has not offered any evidence that would suggest that Officers Davis and Calvano were aware of Deputy Geister's statement or had any personal knowledge regarding its accuracy.  (*See* Compl.; Pl's Resp.; Pl's Resp. to Calvano.)  Therefore, the accuracy of Deputy Geister's statement that Plaintiff was banging her head or body against the cell door is not an issue of material fact when it comes to Officers Davis and Calvano's actions and state of mind.

Plaintiff's First, Fourth and Fourteenth Amendment claims against Police Defendants all arise from variations of two allegations: (1) that Officers Davis and Calvano unlawfully sedated Plaintiff and (2) that Officer Calvano unlawfully restrained Plaintiff in order to sedate her. (*Id.*) It is important to note that Plaintiff does not claim that defendants used more force than necessary to restrain her in order to permit the Paramedics to inject her without injuring her. Instead, she argues that any restraint, including the sedation and the restraint to sedate her, *per se* constitutes excessive force and violates Plaintiff's Fourth and Fourteenth Amendment rights because there was no emergency to justify the involuntary sedation. (*See generally* Pl.'s Resp. at 32; Pl.'s Resp. to Calvano at 33.) Plaintiff also argues that Officers Davis and Calvano's acts of injecting her were in retaliation against her for exercise of free speech. (*See* Compl. ¶ 72; Pl.'s Resp. at 32; Pl.'s Resp. to Calvano at 33.)

Plaintiff, however, fails to distinguish between those defendants who did and did not have the legal authority to decide whether there was an emergency that could justify Plaintiff's involuntary sedation. As a result, Plaintiff's use of boilerplate arguments regarding all four claims against all Defendants disregards each individual Defendant's different role.

With that in mind, and after a brief review of the law of 42 U.S.C. § 1983 ("Section 1983") and qualified immunity, the court addresses the arguments of the parties, starting with the claims against Police Defendants in their individual capacities, then considering the claims against them in their official capacities and finishing with addressing the municipal liability claims against the City of Aspen.

> **b.** ***Legal Standards***

### (i)    Claims Under Section 1983

As mentioned in the Martinez and County Defendants Orders, Plaintiff brings all of her claims under Section 1983, which provides a remedy for constitutional violations committed by state or private actors under color of state law.  *See* 42 U.S.C. § 1983 (2006).  Specifically, Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.*  Thus, to establish a violation of Section 1983, Plaintiff must prove that: (1) Defendants acted under color of state law to deprive her of a right; and (2) that right was secured by the Constitution or the laws of the United States.  *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).  Defendants do not address, and therefore necessarily do not dispute, that Defendants are state actors.  (*See* Aspen Defs.' Br.; Aspen Defs.' Reply.; Calvano's Br.; Calvano's Reply.)  With these general considerations in mind, I address Defendants' arguments in further detail below.

### (ii)    Qualified Immunity

Police Defendants argue that because they did not inject Plaintiff they are entitled to summary judgment on Plaintiff's Fourth and Fourteenth Amendment claims against them in their individual capacities.  (*See* Aspen Defs.' Br. at 15–16 [arguing that "Officer Davis did not sedate Plaintiff"]; Calvano's Br. at 15–17 [arguing that "Plaintiff was not injected by Officer Calvano

nor is there any authority to attribute any such injection to Officer Calvano for purposes of the Fourteenth Amendment"].) They further contend that even if their actions resulted in a violation of Plaintiff's constitutional rights, they are entitled to qualified immunity because Plaintiff cannot show that these rights were clearly established and that reasonable officers in their position would have believed that their conduct violated the Fourth or Fourteenth Amendments. (*See* Aspen Defs.' Br. at 16–19; Calvano's Br. at 17–18.)

As noted in the County Defendants Order, the doctrine of qualified immunity shields government officials from individual liability when they are performing discretionary functions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' The privilege is 'an immunity from suit rather than a mere defense to liability.'" *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (citations omitted). Whether a defendant is entitled to qualified immunity is a question of law. *Derda v. City of Brighton*, 53 F.3d 1162, 1164 (10th Cir. 1995). Once a defendant claims qualified immunity, the plaintiff bears the "heavy two-part burden" of demonstrating that: (1) the defendant's alleged actions violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established at the time of the alleged violation. *Trigalet v. Young*, 54 F.3d 645, 647 (10th Cir. 1995) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534 [10th Cir. 1995]).

In determining whether qualified immunity shields Police Defendants from liability, this court is obligated to consider whether there has been a constitutional violation *before* determining

whether the law was clearly established at the time of the alleged violation. *McCook v. Spring Sch. Dist.*, 44 F. App'x 896, 902 (10th Cir. 2002) (citing *Saucier*, 533 U.S. at 201). The goal in first answering the constitutional question is to ensure that the law of qualified immunity does not stymie the development of constitutional law. *See id.*

Accordingly, the court first turns to the question of whether Plaintiff's allegations are sufficient to support a Section 1983 Fourth, Fourteenth and/or First Amendment claim(s). If they are, the court will then address the issue whether the allegedly violated rights were clearly established at the time and a reasonable officer should have known that he or she was violating such rights.

### c.    *Claims Against Police Defendants in Their Individual Capacities*

Plaintiff has four claims against Police Defendants in their individual capacities: (1) violation of the Fourteenth Amendment against all three; (2) violation of the Fourth Amendment against all three; (3) violation of the First Amendment against Officers Davis and Calvano; and (4) failure to train and supervise, against Chief Ryerson. (*See* Compl.) I first address Plaintiff's claims with respect to Officers Davis and Calvano. Then, I turn to the claims against Chief Ryerson.

### (i)    *Officers Davis and Calvano — Involuntary Sedation in Violation of the Fourteenth Amendment*

As discussed in the Martinez and County Defendants Orders, it is well established that "the forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty," thus triggering the protections of the Due Process Clause.

*Washington v. Harper*, 494 U.S. 210, 229 (1990). In *Harper*, the Supreme Court found that

"forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of

overriding justification and a determination of medical appropriateness." *Riggins v. Nevada*, 504

U.S. 127, 135 (1992) (citing *Harper*, 494 U.S. at 229). Since the Supreme Court's decision in

*Harper*, neither the Supreme Court nor the Tenth Circuit has addressed what due process is

required to sedate a detainee in emergency circumstances.

Prior to *Harper*, however, the Tenth Circuit had already addressed this issue to some

degree in *Bee v. Greaves*, 744 F.2d 1387 (10th Cir. 1984). In *Bee*, the court found that, even

absent a hearing, forcing antipsychotic medication upon a pretrial detainee may be appropriate

when the State makes a showing that "treatment with [such] medication was medically

appropriate and, considering less intrusive alternatives, essential for the sake of [the detainee's]

own safety or the safety of others." *Bee,* at 1395.

Further, according to the court:

> Determining that an emergency exists sufficient to warrant involuntary
> medication with this type of drug requires a professional judgment-call
> that includes a balancing of the jail's concerns for the safety of its
> occupants against a detainee's interest in freedom from unwanted
> antipsychotics. Any decision to administer antipsychotic drugs forcibly
> must be the product of professional judgment ***by appropriate medical
> authorities***, applying accepted medical standards. It requires an
> evaluation in each case of all the relevant circumstances, including the
> nature and gravity of the safety threat, the characteristics of the
> individual involved, and the likely effects of particular drugs.

*Id.* at 1395–96 (internal citations omitted) (emphasis added); *see also Harper*, 494 U.S. at

222-23 (stating that the decision to involuntarily drug must be made by appropriate medical

-21-

authorities); *Hogan v. Carter*, 85 F.3d 1113, 1116 (4th Cir.1996) (finding no due process violation because the doctor, "consistent with accepted professional judgment [decided] that it was in [the inmate's] medical interest to receive the one-time dose of [antipsychotic] in order to protect [the inmate] from imminent, self-inflicted harm."). Therefore, as the court found in the Martinez Order, Dr. Martinez was the person who had the legal authorization to decide whether an emergency existed that justified Plaintiff's sedation. (*See* Martinez Order [concluding that Dr. Martinez's decision to sedate Plaintiff was proper under the circumstances and based on the information before him and acceptable medical standards]).

Moreover, as stated in the County Defendants Order, even if the court had found Dr. Martinez's decision to inject Plaintiff unconstitutional, this court, considering that the law requires medical professionals, not jail staff, to determine independently, based on their professional judgment, whether or not to sedate a detainee, cannot justifying placing "law enforcement officers in the impossible position of having to second-guess the medical judgments" of medical professionals. *Sullivan v. Bornemann*, 384 F.3d 372, 377 (7th Cir. 2004) (finding "[t]here is no rule to the effect that law enforcement officials are constitutionally prohibited from briefly restraining a detainee at the direction of qualified medical personnel, with the purpose of minimizing injury to the detainee"); *see also Bee*, 744 F.2d at 1395–96.

A reasonable law enforcement officer, as a non-medical professional, cannot be expected to question the judgment of a qualified medical professional absent some extraordinary circumstances. Here, Plaintiff has not offered any evidence that establishes such an extraordinary circumstances, *e.g.*, that Officers Davis and Calvano knew about Deputy Geister's allegedly

untrue statement that Plaintiff was banging her head against the cell door and knew it was not true. Moreover, Plaintiff has failed to offer any evidence in support of her allegation that Officers Davis and Calvano actually played a role in the decision to sedate her. (*See* Calvano's Br., SOF ¶¶ 22, 24; *admitted at* Pl.'s Resp. to Calvano, RSOF ¶¶ 22, 24; Pl.'s Resp.)

"To avoid summary judgment, a party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 -772 (10th Cir. 1988) (internal citations omitted). Here, all Plaintiff has offered is her statement that she *thought* paramedics were acting at Officer Davis' direction because the next time she saw Officer Davis after he threatened to sedate her was when he was entering the cell with paramedics. (Aspen Defs.' Br., SOF ¶ 22; *admitted in relevant part at* Pl.'s Resp. ¶ 22.) This does not show that he *did* actually participate in such decisionmaking. Mere conjecture is an insufficient basis for denial of summary judgment. *Branson*, 853 F.2d at 772. Therefore, the court finds that Plaintiff has presented no evidence to counter undisputed testimony that Officers Davis and Calvano did not influence Dr. Martinez's decision to sedate Plaintiff based upon his independent professional judgment. (*See* Aspen Defs.' Br., SOF ¶ 19; *admitted at* Pl.'s Resp., RSOF ¶ 19 [Paramedic Hutchinson testified that the officers did not make any requests of the Paramedics to administer any type of medication and that paramedics "do not take requests from police officers regarding medical care"].)

Plaintiff also argues that Defendants failed to determine properly whether less restrictive means of restraint were appropriate. (Pl.'s Resp. at 31.) As discussed in the Martinez Order, it is

the medical professional's duty to consider the availability of less restrictive alternatives to antipsychotic sedation, "such as segregation or the use of less controversial drugs like tranquilizers or sedatives," not the police officers'. *See Bee*, 744 F.2d at 1396.

In sum: (1) Dr. Martinez, and not Officers Davis and Calvano, was responsible for determining whether an emergency situation existed; (2) Plaintiff has offered no evidence that could prove that Officers Davis and Calvano participated in making the decision to sedate her; and (3) Plaintiff does not offer any factual basis why Officers Davis and Calvano should have had any reason to doubt Dr. Martinez's professional medical decision. Therefore, the court finds that Officers Davis and Calvano did not participate in the decision to sedate Plaintiff and thus did not violate Plaintiff's Fourteenth Amendment rights. This conclusion also affects all Plaintiff's remaining claims, which the court will address in turn.

### (ii) *Officers Davis and Calvano — Restraining Plaintiff so Paramedics Could Sedate her Involuntarily, in Violation of the Fourth Amendment*

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, — U.S. —, 127 S. Ct. 2400, 2405 (2007) (internal citations, quotation marks and

emphasis omitted).[1]  However, the Fourth Amendment prohibits only unreasonable seizures.  *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001).

Plaintiff does not challenge her arrest on probable cause or other grounds.  Nonetheless, she argues that Defendants unlawfully seized her when they forcibly grabbed her in her cell, cuffed and shackled her, injected her without her consent and refused to respect her bodily integrity in the face of her pleading to not to be so seized or injected.  (Compl. ¶ 47.)  More specifically, Plaintiff argues that "the restraint and the injection which the Defendant facilitated were unreasonable seizures constituting excessive force."  (Pl.'s Resp. at 32; Pl.'s Resp. to Calvano at 33.)

"Every person has the right not to be subjected to unreasonable or excessive force while being arrested or detained by a police officer."  *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir.1989) (citing *Graham v. Connor*, 490 U.S. 386 [1989]).  Excessive force claims must be analyzed under the Fourth Amendment's objective reasonableness standard.  *Stuart v. Jackson*, 24 F. App'x 943, 953 (10th Cir. 2001) (citing *Graham*, 490 U.S. at 395).  "The reasonableness of the officer's actions must be assessed from the officer's vantage point at the scene of the alleged violation."  *Id.* (citing *Saucier*, 121 S. Ct. at 2158).  "Such an assessment 'requires a careful

---

[1] "It is not clear that a seizure in the prison context could ever violate the Fourth Amendment, even if it is assumed that it is somehow possible for an incarcerated prisoner to be seized."  *Goldberg v. Higgins*, No. 06-45, 2007 WL 2907209, at * 23 (W.D.Pa. Sept. 28, 2007) (citing *Elliot v. Lynn*, 38 F.3d 188, 191, n.3 [5th Cir.1994] [distinguishing between cell searches and seizures of prisoners through an official's use of excessive force, which never violate the Fourth Amendment, and body cavity searches of prisoners, which may violate the Fourth Amendment under certain circumstances]).

balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (citing *Graham*, 490 U.S. at 396 (quotation omitted).

Here, Plaintiff was physically restrained during the injection and subsequently physically incapacitated by the anitpsychotic medication. However, as discussed in the previous section, both forms of restraint were justified and reasonable under the circumstances of this case. The same analysis that justifies using restraint to help the Paramedics under the Fourteenth Amendment (*see Analysis* § 2 c (i), *supra*), applies to Plaintiff's Fourth Amendment claim as well.[2] Therefore, even read in the light most favorable to Plaintiff, and applying the objective reasonableness test, this court can not conclude that Officers Davis and Calvano's *justified and reasonable* participation in restraining Plaintiff could, *per se,* constitute excessive use of force.[3] *See Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (noting that the "touchstone of the Fourth Amendment is reasonableness").

As a result, the court concludes that Officers Davis and Calvano's actions under the circumstances presented here did not violate Plaintiff's rights under the Fourteenth Amendment.

_____

[2] Again, *see Bornemann*, 384 F.3d at 377 (finding "[t]here is no rule to the effect that law enforcement officials are constitutionally prohibited from briefly restraining a detainee at the direction of qualified medical personnel, with the purpose of minimizing injury to the detainee.").

[3] Again, to be clear, Plaintiff does claim that the restraint and injection were unreasonable seizures constituting excessive force, but she does not allege that Officers Davis and Calvano used more force than necessary to restrain her in order to permit the Paramedics to inject her without injuring her. (*See e.g.*, Pl.'s Resp. at 32; Pl.'s Resp. to Calvano at 33.)

### (iii) *Officers Davis and Calvano — Retaliation in Violation of the First Amendment*

Plaintiff's only remaining claim with respect to Officers Davis and Calvano is her allegation that "Defendants' acts of injecting Plaintiff were motivated by Plaintiff's exercise of constitutionally protected conduct." (Compl. ¶ 72.) Officers Davis and Calvano argue summary judgment is warranted on this claim because Plaintiff's screaming and pounding on the door of her jail cell was not protected speech. (Aspen Defs.' Br. at 22; Calvano's Br. at 24.) Officer Davis also argues that his conduct was not motivated by Plaintiff's speech. (Aspen Defs.' Br. at 23.) Officer Calvano additionally argues that Plaintiff will not be able to "come forward with any case law showing that Officer Calvano either knew or should have known that she was violating Plaintiff's First Amendment rights with regard to Plaintiff's allegedly protected speech." (Calvano's Br. at 25.)

As noted in the County Defendants Order, First Amendment retaliation claims are most often brought in the public employment context. *McCook*, 44 F. App'x at 903. However, when a plaintiff is not an employee of and has no contractual relationship with the defendant, caselaw from this circuit suggests applying the substantive standard announced in *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000); *see McCook*, 44 F. App'x at 902 (applying *Worrell* standard outside the public employment context); *McCormick v. City of Lawrence*, 253 F. Supp. 2d 1156, 1168 (D. Kan. 2003) (same). The *Worrell* standard requires proof of the following elements to support a First Amendment retaliation claim:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a

person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

219 F.3d at 1212 (internal quotations omitted).

Having concluded that the decision to sedate Plaintiff legally rested with and was exercised by the medical authorities, the court does not need to address the first two elements because Plaintiff's claim for retaliation for exercise of free speech fails since, as a matter of law, she fails to prove that the adverse action of sedating her was substantially motivated as a response to her exercise of constitutionally protected conduct for two reasons.

First, Plaintiff's First Amendment claim is based on the argument that Officers Davis and Calvano injected Plaintiff. (Compl. ¶ 72 [claiming that "[t]he Defendants' acts of injecting Plaintiff were motivated by Plaintiff's exercise of constitutionally protected conduct"].) This argument lacks merit in the light of the court's finding that Officers Davis and Calvano were not authorized and did not make the decision to sedate Plaintiff. (*See Analysis* § 2 c (i), *supra*.)

Second, Plaintiff has not offered any evidence that could support an argument that Officers Davis and Calvano somehow injected themselves into the decisionmaking processes and Dr. Martinez's decision to sedate Plaintiff. (*See* Compl.; Pl.'s Resp.; Pl.'s Resp. to Calvano.) Thus, she cannot prove the sedation was motivated by how Officers Davis and Calvano might have felt about Plaintiff's speech or conduct.

Based on the foregoing, the court finds that summary judgment against Plaintiff on her First Amendment claim against Officers Davis and Calvano is warranted.

### (iv)   *Chief Ryerson — Involuntary Sedation in Violation of the First and Fourteenth Amendments*.

Plaintiff does not specify in what way Chief Ryerson personally participated in sedating her. As mentioned in the County Defendants Order, "for liability to arise under [Section] 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006); *see Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (affirming district court's dismissal, in part, where "plaintiff failed to allege personal participation of the defendants"); *accord Clayton v. Ward*, 232 F. App'x 827, 830 (10th Cir. 2007).

Plaintiff does not dispute the fact that Chief Ryerson was not present at the jail on the evening in question. (*See* Pl.'s Resp.) Because Plaintiff has literally presented *no* evidence supporting a finding that Chief Ryerson personally participated in the decision to inject Plaintiff or in the injection itself, (*see* Pl.'s Resp.), the court grants summary judgment in favor of Chief Ryerson on Plaintiff's Fourth and Fourteenth Amendment claims against him, in his individual capacity, for sedating Plaintiff.

### (v)   *Chief Ryerson — Failure to Train and/or Supervise in Violation of Fourth and Fourteenth Amendments*

Plaintiff also alleges constitutional failure to train against Chief Ryerson in his official capacity. (Compl. ¶¶ 57–68.) Aspen Defendants argue that the training provided by Chief Ryerson — that the decision of whether to sedate is to be left to medical professionals — did not constitute deliberate indifference to the rights of Plaintiff. (*See* Aspen Defs.' Br. at 17–18; Aspen Defs.' Reply at 22–24.)

As noted in the County Defendants Order, the Supreme Court has established that "the inadequacy of police training may serve as a basis for [Section] 1983 liability only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989).

As mentioned above, the Aspen Police Department did not have a written policy on the administration of medication to nonconsenting persons, because its officers are not responsible for administering medication. (Pl.'s Resp. to Calvano, Ex. 3 at 2 [Calvano Dep.] [Officer Calvano testified to her understanding that the decision of whether to inject a detainee "gets turned over to the Paramedics and the people in the medical profession. It's not my responsibility to let them waive their medical rights or anything, because that's not my capacity of [sic] my job."].) According to Chief Ryerson, restraining Plaintiff and otherwise directly aiding medics to inject her would not be contrary to the Aspen Police Department's policy. (Pl.'s Resp., SAF ¶ 43; *admitted at* Aspen Defs.' Reply, RSAF ¶ 43.)

As discussed in detail above, it is the medical authorities who must determine whether sedation is appropriate, considering all relevant factors, including whether an emergency exists such that the safety of the detainee or others in the jail are at risk and whether alternative, less restrictive means of restraining the detainee are available. (*See Analysis* § 2 c (i), *supra*.) As the court concluded in the County Defendants Order, leaving this decision in the hands of medical professionals by no means constitutes "deliberate indifference" to the rights of detainees. *See Harris*, 489 U.S. at 389. Instead, it reflects the sound conclusion of the Supreme Court and the Tenth Circuit that medical professionals, rather than law enforcement personnel, are the

individuals most qualified to balance these competing interests.  *See Riggins*, 504 U.S. at 135; *Bee*, 744 F.2d at 1395–96.

Thus, the court holds that employee training and supervision by Chief Ryerson with respect to aiding paramedics to inject detainees was not in violation of Section 1983.  As noted in the County Defendants Order, taken together, the court's findings throughout this order stand for the proposition that, even if Plaintiff's sedation was in violation of the constitution, Plaintiff must look to those who made the decision to sedate her for redress, rather than to law enforcement personnel who were following the Aspen Police Department's  policy and Tenth Circuit law.

### (vi)      *Qualified Immunity*

Accordingly, Plaintiff has failed to demonstrate that the Police Defendants' alleged actions violated her constitutional rights.  *See Trigalet*, 54 F.3d at 647.  Thus, the court need not address whether the constitutional rights in question were clearly established at the time of the alleged violation and whether a reasonable officer should have known that he or she was violating such rights.  *See McCook*, 44 F. App'x at 902.

### d.      *Claims Against Police Defendants in Their Official Capacities*

Plaintiff asserts the same claims against Police Defendants in their official capacities.  As noted in the County Defendants Order, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" — in this case the City of Aspen. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *accord Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978) (noting "official-capacity suits generally represent only another way of pleading an action

against an entity of which an officer is an agent").  Because the court has not found any violation of Plaintiff's rights committed by Police Defendants in their individual capacities, *a fortiori*, it cannot find any violations in their official capacities.  Thus, the court grants summary judgment on Plaintiff's First, Fourth and Fourteenth Amendment claims against Police Defendants in their official capacities.

      *e.*      ***Municipal Liability of the City of Aspen***

City of Aspen does not dispute that municipal entities can be sued for deprivations of constitutional or civil rights under Section 1983.  *See Monell*, 436 U.S. at 690; (*see also* Aspen Defs.' Br.)  But, as mentioned in the County Defendants Order, to establish municipal liability Plaintiff must show: "(1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged."  *Jenkins v. Wood*, 81 F.3d 988, 993–94 (10th Cir. 1996) (citation omitted).  "The official policy must be the moving force for the constitutional violation in order to establish [municipal liability]."  *Haines v. Fisher*, 82 F.3d 1503, 1507 (10th Cir. 1996).  Thus, if a final policymaker's decision results in a constitutional violation, the municipality will be liable for the violation.  *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1319 (10th Cir. 1998).

Plaintiff does not specify which policy of the Aspen Police Department violated her constitutional rights.  (*See* Pl.'s Resp. at 20–21.)  Instead, she generally argues that "Aspen and its police chief are responsible for providing training and supervision of officers sufficient to prevent involuntary injections and the use of excessive force" because they are involved in

sedation of prisoners where they "can substantially influence medical decision-making and participate in 'medication.'" (*See* Pl.'s Resp. at 38–39.)

However, as discussed above, the court found that Police Defendants did not participate in making the decision to sedate Plaintiff. (*See Analysis* § 2 c (i), *supra*) Additionally, the reason Aspen Police Department did not have a written policy on the administration of medication to nonconsenting persons is because its officers are not responsible for administering medication. (*See* Pl.'s Resp. to Calvano, Ex. 3 at 2 [Calvano Dep.]) Therefore, Plaintiff fails to show the existence of a municipal custom or policy to sedate detainees and thus cannot prove the City of Aspen's municipal liability.

Moreover, even assuming that Plaintiff is referring to the Aspen Police Department's policy to leave the decision whether to sedate to medical professionals, she still fails to establish a direct causal link between this policy and the violation alleged. As noted in the County Defendants Order, there is no evidence that the policy of the Aspen Police Department regarding helping the involuntary sedation of individuals in custody, *i.e.*, leaving the decision of whether to sedate to paramedics guided by a physician-advisor, had a "direct causal link" to "the violation alleged." *Jenkins*, 81 F.3d at 993–94. Therefore, the court finds that any connection between the policy of leaving the decision of whether to sedate a detainee to medical professionals and those professionals' ultimate decision to sedate the detainee is far too attenuated to constitute a direct causal link.

The Aspen Police Department's policy comports with Tenth Circuit precedent mandating that the decision to sedate be left to medical professionals. *See Bee*, 744 F.2d at 1395–96. In

fact, the whole point and obvious import of a policy which places the decision of whether to sedate a detainee into the hands of medical professionals is to break any causal chain between law enforcement personnel's actions and any sedation that may occur.

Further, as noted in the County Defendants Order, Plaintiff has presented no evidence that the policy itself — rather than its implementation in her case — was unconstitutional. (*See* Pl.'s Resp.) "[W]here the policy relied upon is not itself unconstitutional, considerably more proof than a single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985).

Here, Plaintiff has only pointed to a single incident of alleged constitutional deprivation. Based on the foregoing, the court finds that Plaintiff has failed to set forth sufficient facts to establish a direct causal connection between the municipal policy and the alleged constitutional violation at issue. Thus, the court grants summary judgment on Plaintiff's Fourth and Fourteenth Amendment claims against the City of Aspen.

## 1. *Conclusion*

Based on the foregoing it is therefore ORDERED as follows:

1.  The Aspen Defendants' Motion for Summary Judgment (# 45) is GRANTED.

2.  Officer Calvano's Motion for Summary Judgment (# 43) is GRANTED.

3.  The clerk shall forthwith enter judgment in favor of Defendants, City of Aspen, Chief Loren Ryerson, Officer Dan Davis and Officer Melinda

Calvano, dismissing all claims with prejudice.  These Defendants may

have their costs by filing a bill of costs within eleven days of the date of

this order.

Dated this 1st day of May, 2008.

                                                            BY THE COURT:


                                                            s/ Edward W. Nottingham
                                                            EDWARD W. NOTTINGHAM
                                                            Chief United States District Judge